STATE of Minnesota, Respondent,

v.

Brent Charles NIELSEN, Appellant.

No. C1–89–2271.

Supreme Court of Minnesota.

April 5, 1991.

John M. Stuart, State Public Defender, Minneapolis, Steven P. Russell, Asst. State Public Defender, St. Paul, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Tom Foley, Ramsey County Atty., St. Paul, for respondent.

COYNE, Justice.

Defendant was convicted of first degree felony murder, Minn.Stat. § 609.185(2) (death while committing or attempting to commit first or second degree criminal sexual conduct with force or violence) and second degree intentional murder, Minn. Stat. § 609.19(1) (death with intent but without premeditation) in the murder of 17-year-old Shelby Pavlacky, and he was sentenced for the more serious offense to a term of life in prison. On this appeal from judgment of conviction he seeks an outright reversal of his first degree murder conviction on the ground that the state failed to prove beyond a reasonable doubt that he killed the victim "while committing or attempting to commit" the rape, a crime he maintains was committed as "an afterthought" to the killing of the victim. Defendant also makes the related claim that the trial court—by allowing the prosecutor to give a rebuttal argument following defense counsel's closing argument and by refusing to give an instruction on bestiality—left the jury with the false impression that it properly could convict him of first degree felony murder even if it believed defendant's testimony that the rape was committed as an afterthought. Finally, defendant complains about the trial court's admission of DNA evidence. We affirm.

Pavlacky was a single mother who was working on her G.E.D. at Hennepin Technical Center. Pavlacky and two classmates, John Klick and Paul Nielsen, wanted to party and they asked defendant, Paul's older brother, to drive. The group began drinking beer about 8 p.m. Fairly early in the evening Pavlacky switched to Jack Daniels bourbon. After picking up two more girls and driving around trying to find a party, they went to the home of one of the other girls. Pavlacky and Paul Nielsen stayed in the car until Pavlacky got sick. She was carried into the house and deposited on the bathroom floor.

The party broke up around midnight. After dropping off the younger Nielsen, defendant drove Pavlacky and Klick to the home of Rob Paro, the father of Pavlacky's child. Paro didn't want Pavlacky to stay there so Paro and Klick suggested defendant take Pavlacky to her mother's house in Coon Rapids; they gave defendant the mother's telephone number but no directions. Klick stayed at Paro's.

Defendant testified that he got lost and pulled off the road to look at the map. Pavlacky awoke and screamed at him. Angered, he struck her across the face. The two began fighting and during the struggle he throttled her. Defendant said that when he realized Pavlacky was dead, he drove around looking for the police but after about a half hour he decided to rape the corpse. Afterwards defendant threw the body from the car.

The next day after work defendant cleaned the blood from his car, then went to Rochester. He gave co-workers and, later, investigators various stories about his black eye and said he had left Pavlacky at a gas station in Hopkins.

Blood on defendant's shirt matched Pavlacky's blood. Blood was found in the car, but there was not enough for typing. The Type A semen sample taken from Pavlacky's body could have come from either defendant or his brother Paul so blood samples from both went to Cellmark for DNA analysis. The Cellmark analysis report contained the conclusion that the DNA of the semen sample matched defendant's DNA, not Paul's. The DNA evidence was admitted over objection, along with testimony that there was a 1 in 9.5 million Caucasians chance of an identical match.

Defendant admitted that he had hoped for some sexual activity with one of the

other girls on the night of the murder, but he testified that he had told his fiance and a fellow prisoner that he didn't have sex with Pavlacky until after her death. The autopsy did not disclose whether the sexual assault took place before or after death, but many of Pavlacky's wounds and the disarray of her clothing (the upper body clothing was torn) were consistent with a sexual assault.

Defendant complains first that the evidence is insufficient to support his first degree felony murder conviction. There is, of course, more than sufficient evidence that defendant killed Pavlacky. Defendant contends, however, that he should have been acquitted of first degree felony murder because the rape was an afterthought to the homicide, thereby requiring the homicide and the criminal sexual conduct to be considered two separate transactions. Therefore, defendant claims, the most serious crimes of which he could be convicted were second degree murder and bestiality.

 One who "[c]auses the death of a human being while committing or attempting to commit criminal sexual conduct in the first or second degree with force or violence, either upon or affecting the person or another," is guilty of murder in the first degree. Minn.Stat. § 609.185(2) (1990). In Minnesota the felony-murder rule applies whenever the felony and the homicide "are parts of one continuous transaction." *Bellcourt v. State*, 390 N.W.2d 269, 274 (Minn.1986) [quoting *Kochevar v. State*, 281 N.W.2d 680, 686–87 n. 4 (Minn.1979)]. Thus, the felony-murder rule applies even though the underlying felony is completed after the homicide, provided the felony and the homicide are parts of a single "continuous transaction." *Compare State v. LaTourelle*, 343 N.W.2d 277 (Minn.1984) (defendant convicted of first degree felony murder where defendant intended to rape victim prior to the homicide but the rape took place after the homicide) *with State v. Givens*, 332 N.W.2d 187 (Minn.1983) (defendant acquitted of first degree felony murder where defendant participated in murder of victim, then

returned to murder scene a short time later to rape victim).

The defendant correctly points out the absence of scientific evidence that the sexual assault took place while the victim was alive: the autopsy did not reveal whether penetration occurred before or after Pavlacky's death. Nevertheless, there was a great deal of evidence from which the jury could conclude that death occurred during or as the result of a sexual assault. Many of the victim's wounds, the disarray of her clothing, and the way in which the clothing had been torn from her upper body were suggestive of, or at least consistent with, a sexually motivated assault. The jury was not required to believe defendant's tale of bestiality—that the thought of sexual activity did not occur to him until after he had driven around for a half hour in a vain search for a policeman to whom he could turn over Pavlacky's dead body. Even if the rape occurred after death, the jury could have believed that the assault was sexually motivated and that the criminal sexual conduct and the homicide were one continuous transaction, making the crime first degree felony murder.

 The defendant also makes the related claim that the trial court—by allowing the prosecutor to give a rebuttal argument following defense counsel's closing argument and by refusing to give an instruction on bestiality—left the jury with the false impression that it properly could convict him of first degree felony murder even if it believed defendant's testimony that the rape was committed as an afterthought.

During his summation, defense counsel told the jury,

> [W]hen you listen to the instructions relevant to criminal sexual conduct, you will hear that Miss Pavlacky had to be alive, that it's a live person.

He went on to say that the jury must determine whether or not it had been proved Pavlacky was alive at the time she was penetrated and that the state had the burden of proof.

The trial court granted permission for a brief rebuttal in which the prosecutor told

the jury that the instructions would not contain a statement that Shelby Pavlacky had to be alive when sexual penetration occurred. Whether penetration occurred before she died, when she was unconscious, or just after she died, it was first degree murder if the killing and the rape were one continuous transaction.

Implicit in the trial court's disposition of the prosecution's motion is the determination that the defense had misstated the law. Notwithstanding the defendant's objection, that determination was correct, the permission to rebut was appropriate, and the rebuttal was properly limited to a short and direct response to the misstatement. Minn.R.Crim.P. 26.03, subd. 11(j).

■ Although defendant recognizes that bestiality could not be submitted to the jury as a lesser-included offense, Minn. Stat. § 609.04, subd. 1 (1990), he argues that the absence of an instruction on bestiality deprived him of the ability to put before the jury his "theory of the case." The defendant's "theory of the case" was that death occurred in the course of an assault which was not sexually motivated and that the idea of sexual intercourse with Pavlacky did not occur to him until about a half hour after her death. In fact, that theory was discussed at length in the final summations of both the state and the defense. The theory was addressed by the trial court in its jury instruction on felony murder in the first degree when the court emphasized the necessity of proof that death occurred while defendant was committing or attempting to commit criminal sexual conduct and that the killing and the criminal sexual conduct were part of one continuous transaction. There can be no question that the jurors fully understood that if they found that the killing and the criminal sexual conduct were separate and unconnected transactions, they must find the defendant not guilty of first degree felony murder. Defendant's theory would not have been advanced by his requested instruction, and the trial court did not err in declining to include it.

Defendant's final contention is that the trial court erred in allowing the state to present expert testimony relating to DNA typing and population frequency statistics.

In *State v. Schwartz*, 447 N.W.2d 422 (Minn.1989), we held, *inter alia*, that although forensic DNA typing has gained general acceptance in the scientific community, the test results in that case were inadmissible because the testing laboratory, Cellmark, did not comply with the guidelines adopted in *Schwartz*. This case was tried before *Schwartz* was filed. The analysis was performed by Cellmark, the same company whose controls and standards we criticized in *Schwartz*.

■ Even assuming, without deciding, that the state in this case did not meet the subsequently adopted foundational requirements of *Schwartz* and therefore that the evidence was improperly admitted, defendant is not entitled to any relief on this basis because any error in admitting the evidence clearly did not have a significant impact on the verdict and was harmless. Pavlacky was last seen alive with defendant within several hours of the estimated time of death; blood matching Pavlacky's blood was discovered on defendant's shirt; untypable human blood was discovered in defendant's car; defendant's blood type matched the blood type from the semen found on Pavlacky's body; defendant had a black eye the next day about which he gave conflicting explanations; defendant unexpectedly left for Rochester after being told that the police wanted to talk with him; and defendant claimed he dropped Pavlacky off at a gas station which in fact was closed at the time. It is clear that even without the DNA evidence the result would have been the same.

■ Although defendant is not entitled to any relief, we note in passing that the trial court in this case denied a defense request for a pre-trial hearing to determine whether the state could establish the necessary foundation for admission of the evidence under the Minnesota Rules of Evidence. The day may soon come when laboratory DNA testing will be so routine and the *Schwartz* guidelines so universally followed that there will be no need in a particular case for a hearing out of the jury's

presence to determine if the foundation for admission of the expert opinion testimony has been established. If, for example, the Minnesota Bureau of Criminal Apprehension should begin to perform all of the DNA testing in Minnesota and should, as a matter of bureau policy, follow all the *Schwartz* guidelines, the adequacy of foundation might routinely be unquestioned. Until then, however, the trial court should grant any reasonable defense request for an evidentiary hearing on the issue outside the jury's presence, either pre-trial as part of the omnibus hearing or mid-trial. *See* Minn.R.Evid. 104 and Minn.R.Crim.P. 7.01, 8.03, 11.02 and 11.04.

We also remind the bench and bar that we have not addressed or decided whether Minn.Stat. § 634.26 (Supp.1989), providing for the admission of statistical probability evidence relating to DNA test results, has the effect of legislatively creating an exception for DNA evidence to the limitations of *State v. Kim,* 398 N.W.2d 544 (Minn. 1987), on the use of statistical probability evidence in criminal trials. We note, however, that in *Schwartz* we expressly reiterated that trial courts should rely on the *Kim* limitation in DNA cases. Moreover, while refusing in *Schwartz* to decide the effect of the enactment of section 634.26, we cited, as a precaution to trial courts, the discussion in *State v. Willis,* 332 N.W.2d 180, 184 (Minn.1983), of the separation of powers doctrine and the recognition therein that this court, not the legislature, has the primary responsibility for adopting rules relating to the admission of evidence in trials. 447 N.W.2d at 429 n. 6.

Affirmed.

GARDEBRING, J., took no part in the consideration of this case.