STATE of Minnesota, Respondent,

v.

Sarith PEOU, Appellant.

No. C3–97–289.

Supreme Court of Minnesota.

May 21, 1998.

Leslie J. Rosenberg, Special Assistant State Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Attorney General, Susan Gaertner, Ramsey County Attorney, Mark Nathan Lystig, Assistant Ramsey County Attorney, St. Paul, for respondent.

## OPINION

GARDEBRING, Justice.

Sarith Peou appeals from his conviction of two counts of murder in the first degree while committing aggravated robbery, Minn. Stat. § 609.185(3) (1996), for the killing of two St. Paul residents in July 1996. The jury also found him guilty of two counts of murder in the second degree, Minn.Stat. § 609.19, subd. 1(1) (1996), but acquitted him of premeditated murder in the first degree. Peou was sentenced to two consecutive life sentences for the two first-degree murder convictions.

On appeal, Peou sets forth four issues for review: (1) whether the trial court abused its discretion by denying appellant's request to add language relating to the timing of intention to commit the felony to the felony murder jury instructions; (2) whether the trial court abused its discretion by refusing to instruct the jury on the lesser included offense of first-degree manslaughter; (3) whether the evidence is sufficient to show that the appellant did not act in self-defense; and (4) whether the evidence is sufficient to find appellant guilty of first-degree murder while committing an aggravated robbery. We hold that the trial court did not abuse its discretion with regard to the jury instructions and that the evidence is sufficient to withstand the self-defense claims and to uphold the conviction. The conviction is affirmed.

Both victims, Botha Thin and Se Meng Lo, as well as the appellant, Peou, are Cambodian immigrants. Thin and Lo were married and owned a jewelry store in St. Paul. Evidence at trial showed that Peou had been very active in the Cambodian community, here and nationally, through his employment and a variety of civic activities. However, at the time of the murders, Peou had been unemployed for almost a year and had only been doing free-lance translating. His unemployment assistance had run out, he had lost his home, and he and his wife had been intermittently separated for some period of time. He had also lost several thousand dollars gambling. At the time of the murders, Peou was taking an anti-depressant medication.

While Peou had limited liquid assets, he had several pieces of diamond jewelry, including a ring valued at more than $8,000, which he had pawned at Thin's jewelry store in May 1996. When he pawned the ring, Peou received $5,000 for it; he later returned to the store, asking Thin if he could get another $1,000 for the ring. Thin refused but instead offered to buy the ring from Peou outright. Peou refused to sell the ring.

The details of what happened on the day of the murders were presented principally through Peou's own testimony at the trial, although there was some testimony by one of Thin's sons, as well. According to Peou, he entered the store, to discuss the possibility of obtaining additional money for the ring he had previously pawned. Thin and Peou had an extended conversation, during which time Thin's wife, Lo, returned to the store. Thin's two oldest boys were outside during most of the conversation, but came in and out periodically. One of the boys testified at trial that Peou and Thin were talking in normal tones during the parts of the conversation that he heard and Peou testified that the two talked politely about various matters, including business activities such as collecting rent from tenants.

Peou offered to sell the ring to Thin if the two could agree upon a price. Thin said that he had to clean the ring before making an offer and invited Peou to go with him to the back of the store while he cleaned the ring.

After cleaning the ring, Thin was still unsure as to its value, so he called someone to find out the current rates for diamonds. That person was supposed to call Thin back, but no one ever called back with information as to the ring's likely value.

According to trial testimony, the tone of the conversation changed at this point because Peou felt that Thin was trying to cheat him as to the value of the ring. Peou asked Thin if he could sell it to someone else who came into the store. Thin refused to allow Peou to sell the ring through the store and they began to argue. Thin then told Peou that he was going to increase the interest payments if he held the ring past the agreed-upon period. Peou thought that this was illegal and threatened to call the police. Thin told Peou that he could deal with the police better than Peou could and that he could tell the police that Peou came in to make trouble or to rob him. Peou then threatened Thin, saying that if Thin told the police that he was trying to rob him, he would "get [his] head break," meaning that he would beat Thin up.

Peou testified that Thin grabbed a knife and continued to argue with him. He further said that he believed that Thin was going to stab him because Thin said "ah om bang kbaul," which means "you die and leave your mom alone." [1] Peou then reached for the knife and began to struggle with Thin. Thin called for his wife to get a gun as the struggle continued. Lo did retrieve a gun, and Peou testified that he thought she was going to shoot him. However, Lo was apparently unable to fire the gun.

During the struggle, Peou began stabbing Thin. Peou testified that he continued to stab Thin because he was afraid that if he let him go he would get the gun. He also began stabbing Lo to prevent her from shooting him. The struggle continued between Peou and Thin, and Peou continued to stab Thin. Peou described the atmosphere as one of panic and fear. At one point, one of Thin's sons came into the store and began hitting Peou with his tennis racquet. Thin's son

beckoned the other son; both boys entered the store toward the end of the struggle and found Peou asking for help. The boys then went upstairs to a restaurant behind the store and called 911.

A police officer who was having lunch at the restaurant apprehended Peou on the back stairway of the jewelry store. Peou testified that he was trying to go up the back stairway to the restaurant to get help. His diamond ring and several gold chains were found beside him on the stairs when he was arrested. Peou testified that he did not intend to steal, but felt that he was entitled to the return of his ring.

Thin and Lo's bodies were found on the floor of the jewelry store, Thin's body on top of Lo's. The gun that Lo had attempted to use was found underneath her body; its safety mechanism was still engaged. Thin had more than 40 knife wounds, and was pronounced dead at the scene. Lo had suffered a total of 11 wounds, and died at the hospital.

At trial, one of Thin's sons testified that neither the knife that was used in the murders nor a homemade knife sheath later found in the store had been present in the store before the murders.

The defense theory was that Peou did not intend to rob or murder the victims, and that he acted in self-defense to save his own life, or at worst, committed the murders "in the heat of passion." Peou testified that Thin's grabbing of the knife and Lo's attempts to fire a gun at him caused him to fear for his life and resulted in the stabbing deaths of both victims.

Defense counsel objected to the trial court's jury instruction on the issue of intent for the felony murder, seeking the addition of certain language on the issue. Defense counsel also requested that the trial court include jury instructions on first-degree manslaughter, as a lesser included offense, because there was evidence in the record from which a jury could conclude that the killings occurred in the heat of passion. The trial court denied both requests.

1. In police interviews, Peou described the incidents leading up to the stabbings in several different ways. Although his testimony at the time of trial was that Thin had threatened him, he did not describe any threats by Thin during several interviews with police.

■ First, this court must address whether the trial court abused its discretion by denying Peou's additional proposed jury instructions on felony murder and by refusing to instruct the jury on the lesser included offense of first-degree manslaughter. When determining the adequacy of jury instructions, we have held that "[a] refusal to give a requested jury instruction in a criminal case lies within the broad discretion of the trial court," and that "[t]he trial court is given considerable latitude in selecting the language for jury instructions." *State v. Auchampach,* 540 N.W.2d 808, 816 (Minn.1995) (citations and internal quotations omitted). Further, it is well settled that the court's charge to the jury must be read as a whole, and if, when so read, it correctly states the law in language that can be understood by the jury, there is no reversible error. *State v. Anderson,* 261 Minn. 431, 435, 113 N.W.2d 4, 7 (1962). In making this evaluation, we are to assume that the jurors were intelligent and practical people. *State v. Edwards,* 269 Minn. 343, 350, 130 N.W.2d 623, 627 (1964).

■ One who "causes the death of a human being with intent to effect the death of the person or another, while committing or attempting to commit * * * aggravated robbery" is guilty of murder in the first degree. Minn.Stat. § 609.185(3) (1996). "[T]he felony murder rule is [applicable] if the felony and the killing * * * are parts of one continuous transaction." *State v. Russell,* 503 N.W.2d 110, 113 (Minn.1993) (citations and internal quotes omitted). "Thus, the felony-murder rule applies even though the underlying felony is completed after the homicide," provided both are part of a continuous transaction. *State v. Nielsen,* 467 N.W.2d 615, 618 (Minn. 1991).

In this case, the trial court instructed the jury that "it does not matter if the aggravated robbery was attempted or committed before, during, or after the death of Botha Thin, as long as it was done as part of a continuous transaction." The trial court also instructed the jury that Peou must have intended to cause the deaths of the victims and also must have been engaging in the act of committing or attempting to commit the crime of aggravated robbery at the time of the killings to be found guilty of this charge.

The defense counsel objected to this instruction, requesting additional language be added to clarify the law as to the timing of the intent to commit aggravated robbery. Specifically, the exchange between the trial court and defense counsel went as follows:

THE COURT: The defense objects to the Court including in the elements of murder in the first degree while committing aggravated robbery, the last paragraph, "For purposes of this statute it does not matter if the aggravated robbery was attempted or committed before, during, or after the death of Botha Thin, as long as it was done as part of a continuous transaction." * * * You may state your objection and your argument.

DEFENSE COUNSEL: [O]ur objection was based on the fact that that statement, while it may be a correct statement of law with respect to the continuous transaction, * * * * our objection is that that particular statement tends to confuse the jury and infer [sic] that, in fact, the element of intent is not a necessary element and that it can be formed after the fact of a homicide, not prior thereto. For that reason I have asked the Court to be consistent with Minnesota Criminal JIGS [i.e., Jury Instruction Guides] in this matter and add a continuous sentence to that that the jury should be instructed that, "However, the jury must believe that the defendant intended to commit the crime of aggravated robbery prior to the assault," and stressing the point that intent was the essential element in this crime and that it had to be formed prior thereto.[2]

Peou argues that, although it was a technically accurate statement of the law, the instruction with regard to the timing of the aggravated robbery itself may have confused the jury by suggesting that the intent to commit the robbery could be formed after the homicide had already occurred.

**2.** No such additional sentence is found in CRIM-JIG 11.08 or 11.09, which are the applicable instructions for this charge. *See* Minn. Dist. Judges Ass'n, *Minnesota Practice,* CRIMJIG 11.08–.09 (3d ed.1990).

■ Considering the significant discretion afforded to the trial court in crafting jury instructions, we conclude that there was no error in the instructions given to the jury on felony murder. The trial court instructed the jury with a correct statement of the substantive law—that the murder and robbery must be part of a continuous transaction—and provided the jury with a basis for understanding the intent required for a finding of guilt of felony murder. Even if the additional sentence requested by defense counsel might have further clarified the issue for the jury, if "the substance of a particular instruction is already contained in the court's instructions to the jury, the court is not required to give the requested instruction." *Auchampach*, 540 N.W.2d at 816. Such is the case here. Therefore, we hold that the jury was adequately instructed on the charge of first-degree murder while committing an aggravated robbery.

■ Next, we address Peou's assertion that the trial court abused its discretion by refusing to submit to the jury the lesser included offense of first-degree manslaughter. Minnesota Statute § 609.04, subd. 1 (1996) provides that upon prosecution, a defendant "may be convicted of either the crime charged or an included offense, but not both." In deciding if a lesser included offense should be submitted to the jury, this court has said the following:

> "The determination of what, if any, lesser offense to submit to the jury lies within the sound discretion of the trial court, but where the evidence warrants an instruction, the trial court must give it." An instruction on a lesser charge should be submitted when: (1) the offense in question is an "included" offense; and (2) a rational basis exists for the jury to convict appellant of the lesser offense and acquit him of the greater crime.

*State v. Buntrock*, 560 N.W.2d 383, 386 (Minn.1997) (quoting *Bellcourt v. State*, 390 N.W.2d 269, 273 (Minn.1986)). In this case, there is no question that first-degree manslaughter is an included offense within the charge of felony murder, therefore the only inquiry is whether the jury would have a rational basis to convict Peou of first-degree

manslaughter and acquit him of felony murder. *See Bellcourt*, 390 N.W.2d at 273 (holding that every lesser degree of homicide is intended by the statute as an included offense).

■ To convict of first-degree manslaughter, a jury must find that (1) the actor intentionally caused the death of another person; (2) the killing was done in the heat of passion; and (3) the actor was provoked by such words or acts of another as would provoke a person of ordinary self-control under like circumstances. Minn.Stat. § 609.20(1) (1996); *see also Buntrock*, 560 N.W.2d at 386. A determination of whether a killing was done in the heat of passion is a subjective question focusing primarily upon the emotional state of the actor; however, the "adequacy of provocation is to be judged from the perspective of a person of ordinary self-control under like circumstances," which is an objective question. *Buntrock*, 560 N.W.2d at 386–87 (citation omitted).

Peou argues that, given the evidence in this trial, the jury could have reasonably concluded that he was acting in the heat of passion. He points to his "powerlessness" to respond to a threat of false arrest for a serious crime and his potential loss of face in a culture which places great value on one's community reputation. He also identifies the number and type of wounds to the victims, which were characterized by the medical examiner as resulting from a "frenzy of fury stabbing," as evidence of utter loss of control.

We find Peou's argument unpersuasive. While Peou indeed may have killed the two victims while in a frenzy, the critical analysis under *Buntrock* focuses on the characteristics of the provocation, and on this key point, Peou's claim falls far short of the standard. The incident that led to the murders in this case was related to a business transaction. The provocation associated with a dispute about the value of a ring does not seem sufficient to incite "a person of ordinary self-control" to commit a double homicide. Similarly, the threats exchanged between Peou and Thin, even considering the cultural context, are not of a type likely to provoke murder. Under these circumstances, no rational basis exists for the jury to convict

Peou of first-degree manslaughter and acquit him of felony murder. Therefore, we hold that the trial court did not abuse its discretion by refusing to submit the lesser included offense of first-degree manslaughter to the jury.

█ Peou next asserts that the evidence in this case is insufficient to show that he did not act in self-defense when committing the murders. It is the state's burden to prove beyond a reasonable doubt that a defendant did not act in self-defense, once that affirmative defense has been asserted. *State v. Boitnott*, 443 N.W.2d 527, 532 (Minn.1989). When evaluating the sufficiency of the evidence to determine whether the state has met its burden of proof on this or other issues, this court will not disturb a verdict if the jury, acting with due regard for the presumption of innocence and the burden of finding guilt beyond a reasonable doubt, could reasonably conclude that the defendant was guilty. *State v. Thompson*, 544 N.W.2d 8, 11 (Minn.1996). In reviewing the record, "we must view the evidence in the light most favorable to the jury's verdict, assuming the jury believed the state's witnesses and disbelieved any evidence to the contrary." *State v. Merrill*, 428 N.W.2d 361, 366 (Minn.1988).

The legislature defines a justifiable killing as "[t]he intentional taking of the life of another * * * when necessary in resisting or preventing an offense which the actor reasonably believes exposes the actor or another to great bodily harm or death." Minn.Stat. § 609.065 (1996). This court has also set forth three conditions which must exist before a successful claim of self-defense can be made:

(1) The killing must have been done in the belief that it was necessary to avert death or grievous bodily harm.

(2) The judgment of the defendant as to the gravity of the peril to which he was exposed must have been reasonable under the circumstances.

(3) The defendant's election to kill must have been such as a reasonable man would have made in light of the danger to be apprehended.

*Bellcourt*, 390 N.W.2d at 272. We have further stated that an aggressor has no right to a claim of self-defense, but if the aggressor withdraws from the conflict and communicates that withdrawal, expressly or impliedly, that aggressor may then make a self-defense claim. *Id.*

Peou asserts that the evidence is insufficient to show that he did not act in self-defense for four reasons: (1) that he killed the two victims because he believed that they would kill him; (2) that his judgment regarding the gravity of the situation was reasonable under the circumstances; (3) that his decision to defend himself was reasonable in light of the perceived danger and lack of alternatives; and (4) that, even if he was the original assailant, the state failed to disprove that he was justified in using force.

In light of these assertions, this court must determine whether a jury could "reasonably conclude" that Peou did not act in self-defense. *Thompson*, 544 N.W.2d at 11. Based upon the evidence presented, we conclude that the state met its burden in this regard. First, the description of events leading up to the murders was supplied principally by Peou's testimony; there were no other eyewitnesses to most of the struggle between Peou and Thin. The jury was free to believe Peou's version of events or to disbelieve him. Therefore, the jury could have reasonably concluded that Peou was the aggressor and did not fear for his life. Second, the jury could reasonably conclude that the nature and extent of the victims' injuries, which were numerous and extensive, showed that Peou was never in any danger himself, but rather was the attacker. Third, the jury could also reasonably conclude that Peou's financial and emotional status caused him to misjudge the actual peril and attack the victims, whereas a reasonable man would not. Finally, if the jury concluded that Peou was the aggressor, there are no facts in evidence suggesting that he withdrew from the conflict and communicated his withdrawal to the victims.

The defense theory that the victims were killed in self-defense was amply explored at trial, through both Peou's testimony and argument by defense counsel. The jury also

heard the state's evidence as to the circumstances of the killing. In the absence of any eyewitness testimony, the jury was left to reconstruct the events surrounding the shootings and apparently simply did not believe that Peou acted in self-defense. Therefore, we hold that there is sufficient evidence to support a finding that Peou did not act in self-defense.

Finally, in an argument related to his previous assertion with regard to the jury instructions on felony murder, Peou argues that there is insufficient evidence to support his conviction of felony murder because the state has not proven that his intention to commit robbery was formed before he killed Thin and Lo. He maintains that the robbery was only an afterthought; after committing the murders, he simply wanted his ring back.

This court has held that the felony murder rule is applicable "as long as the 'fatal wound' was inflicted during the 'chain of events' so that the requisite time, distance, and causal relationship between the felony and killing are established." *State v. Arrendondo*, 531 N.W.2d 841, 844 (Minn.1995). However, relying upon this court's decision in *State v. Bookwalter*, 541 N.W.2d 290 (Minn.1995), Peou urges this court to conclude that the evidence supported only a jury determination that he committed robbery as an "afterthought." In *Bookwalter*, we held that no "single criminal objective" was demonstrated in a case where the defendant raped the victim and later attempted to murder her. *Id.* at 295. In addition to the fact that *Bookwalter* is a sentencing case, and thus not directly applicable, it is also distinguishable on its facts: there, the two crimes occurred over an extended period of time and at two separate locations, thus defeating the necessary unities of time and site. *Id.* at 296. In the instant case, the murders and the robbery occurred at the same location within a short period of time. Furthermore, Peou came to the store specifically to recoup the value of the ring, suggesting that the murders were caused by his desire to rob the victims.

This case is more analogous to *State v. Nielsen*, 467 N.W.2d 615 (Minn.1991), in which the defendant argued that he raped the victim after he murdered her as an "afterthought." *Id.* at 617. In affirming the felony murder conviction, this court emphasized the jury's role, stating that "[e]ven if the rape occurred after death, the jury could have believed that the assault was sexually motivated and that the criminal sexual conduct and the homicide were one continuous transaction, making the crime first degree felony murder." *Id.* at 618.

Similarly, considering the state's evidence in the light most favorable to the verdict, we conclude that, even though the robbery occurred after the murders, the jury could have believed that Peou entered the store with a motive to commit robbery based upon evidence that he was badly in need of money and that he had quarreled with Thin over the value of previously pawned property. We conclude that the evidence was sufficient to support Peou's conviction of felony murder.

In summary, we conclude that the trial court did not abuse its discretion by denying Peou's request for an additional jury instruction or by refusing to submit the lesser included offense of first-degree manslaughter to the jury. Further, the state met its burden of proving that Peou did not act in self-defense. The evidence is also sufficient to support Peou's conviction of felony murder, under Minn.Stat. § 609.185(3).

Affirmed.