**STATE of Minnesota, Respondent,**

v.

**Elizer Eugene DARRIS, Appellant.**

No. C8–01–1587.

Supreme Court of Minnesota.

July 25, 2002.

John M. Stuart, State Public Defender, Ann McCaughan, Assistant State Public Defender, Minneapolis, for Appellant.

Mike A. Hatch, Minnesota Attorney General, Thomas Rolf Ragatz, Assistant Attorney General, St. Paul, for Respondent.

Wayne H. Swanson, Polk County Attorney, Polk County Courthouse, Crookston, for Respondent.

## OPINION

GILBERT, Justice.

Elizer Eugene Darris, appellant, appeals from his conviction of first-degree murder during the commission of an aggravated robbery in violation of Minn.Stat. § 609.185(3) (2000) for the July 15, 1999, killing of Cornelius Rodgers. Appellant claims that there is insufficient evidence to support his conviction of first-degree felony murder or the jury's verdict that he was guilty of second-degree intentional murder in violation of Minn.Stat. § 609.19, subd. 1(1) (2000). Appellant also claims that the trial court erred by instructing the jury on a defendant's right not to testify on his own behalf without first obtaining appellant's permission on the record and that the state committed prosecutorial misconduct during closing argument. For these reasons, appellant seeks reversal of his first-degree felony murder conviction and seeks a new trial on the charge of second-degree murder during the commission of an assault in violation of Minn. Stat. § 609.19, subd. 2(1) (2000), for which the jury also returned a verdict of guilty. Appellant alternatively requests that we remand this case for sentencing on second-degree felony murder. We reverse appellant's conviction of first-degree murder during the commission of an aggravated robbery, affirm the trial court in all other respects, and remand for entry of conviction on the verdict of second-degree intentional murder and for resentencing.

The body of Cornelius Rodgers was discovered in a drainage ditch in Polk County on July 27, 1999, by a local crop farmer. The medical examiner who examined Rodgers' body testified that Rodgers suffered both numerous lacerations to his head and depressed skull fractures. The medical examiner determined that Rodgers died as a result of traumatic head injuries due to an assault and that his death was a homicide.

Prior to his death, Rodgers belonged to a group of carnival workers in Grand Forks calling itself the "Gangster Disciples." Appellant was also a member of the group. Before Rodgers was killed, he took some beer to drink that did not belong to him from a refrigerator in the motel room where appellant was staying with his girlfriend and another person. Appellant had to pay for the beer. Appellant was upset with Rodgers for taking the beer without paying for it. Multiple witnesses testified that taking the beer without paying for it was a violation of the rules of the Gangster Disciples and would result in Rodgers being beaten. Jeremy Langer, a new initiate to the Gangster Disciples, testified that as part of his initiation into the Gangster Disciples, appellant and two other members, David Johnson and Timothy Shanks, told Langer he was to beat up Rodgers. Langer testified that Shanks ordered "a hit" on Rodgers, which Langer believed to mean Rodgers was to be beaten. In addition, appellant's girlfriend overheard appellant discussing beating up Rodgers with Anthony Eley, another member of the Gangster Disciples. Appellant also asked one of Langer's friends whether the friend had ever killed anyone.

Members of the Gangster Disciples, including appellant, gathered at bunkhouses provided for the carnival workers one evening after work to beat Rodgers, but the altercation was interrupted by carnival supervisors. A few days later, Rodgers went to a laundromat, where appellant and his girlfriend were doing their laundry. Appellant and Rodgers went outside the laundromat, and Eley drove up in a hatchback car. Rodgers and appellant got into the

car with Eley. Appellant told his girlfriend that they were going to a local bar but that she could not accompany them, which she said was unusual because normally she would have accompanied them.

Appellant, Rodgers, and Eley drove a block away to a liquor store, where Rodgers bought vodka and beer. They then drove 5 to 6 miles out into the countryside. During the drive, appellant told Eley that appellant had to "toss [Rodgers] up," and appellant and Rodgers argued about how each could whip the other. Eley pulled over onto the side of the country road and got out to urinate. Both Rodgers and appellant got out of the car as well. Eley observed appellant rummaging in the back of the car. After Eley was done urinating, he approached Rodgers and pushed him in the back, telling him either to whip appellant or to get back into the car, because Eley was leaving. Rodgers, who was intoxicated, fell. As Rodgers tried to get up, appellant struck him in the head three times with a car jack. Eley testified that he heard a popping sound, "like a bone break or something, a pop." The second and third blows were delivered while Rodgers was on the ground. Appellant then pulled Rodgers' body to the side of the road. The police later discovered a car jack in the car with blood on it. DNA testing of the blood showed that Rodgers' DNA profile matched the DNA profile of the blood samples taken from the jack. The medical examiner testified that the jack could have been the source of Rodgers' head injuries and also that she was able to place the jack precisely into one of the injuries to Rodgers' head.

After appellant struck Rodgers and moved his body, Eley and appellant started to leave, but appellant stated that they had to return for Rodgers' ID's so that he could give them to David Johnson. Eley had driven approximately 50 yards, stopped when appellant told him to do so, and backed the car up. Appellant got out of the car and ran down into the ditch to the body, returning with two to three pieces of paper that appeared to Eley to be identification papers, as well as some other papers. Appellant gave one of the identification papers to Eley to give to Johnson. Eley then took appellant back to the laundromat. Appellant told his girlfriend that they had taken care of Rodgers and showed Rodgers' identification to her.[1] Appellant later either gave or attempted to give two forms of Rodgers' identification to Johnson, though Johnson testified that he did not accept them.

Johnson, Eley, Langer, appellant's girlfriend, and appellant were all arrested and charged with various offenses stemming from the incident. Johnson had charges against him dismissed and was given immunity for his testimony. Eley, Langer, and appellant's girlfriend entered pleas to aiding and abetting an unintentional murder, conspiracy to commit an assault in the first degree for the benefit of a gang, and aiding an offender, respectively, and each agreed to testify against appellant. Appellant was indicted in Polk County District Court on one count of first-degree premeditated murder in violation of Minn.Stat. § 609.185(1) (2000), first-degree murder during the commission of an aggravated robbery in violation of Minn.Stat. § 609.185(3), and two counts of first-degree murder committed for the benefit of a gang in violation of Minn.Stat. § 609.229, subd. 2 (2000). The court dismissed Counts III and IV after the state conceded

---

1. Appellant's girlfriend testified that appellant produced two identification "cards" with Rodgers' picture on them.

that the Gangster Disciples did not meet the statutory definition of a gang.

At trial, appellant waived his right to testify. At the conclusion of the trial, the trial court instructed the jury, without appellant's express permission, that it was not to draw any inferences from appellant's silence. The jury acquitted appellant of first-degree premeditated murder but returned verdicts of guilty of first-degree murder during the commission of an aggravated robbery, second-degree intentional murder, and second-degree murder during the commission of an assault. The trial court entered conviction of first-degree murder during the commission of an aggravated robbery and sentenced appellant to life in prison.

## I.

■ We must first determine whether there is sufficient evidence to support appellant's conviction of first-degree murder during the commission of an aggravated robbery and the jury's verdict that appellant was guilty of second-degree intentional murder. In reviewing a claim of insufficiency of the evidence, we are limited to ascertaining whether, given the facts in the record and the legitimate inferences to be drawn from those facts, a jury could reasonably conclude that the defendant was guilty of the offense charged. *State v. Merrill*, 274 N.W.2d 99, 111 (Minn.1978). We take the view of the evidence most favorable to the state, and we must assume that the jury believed the state's witnesses and disbelieved any contradictory evidence. *Id.* If the jury, giving due regard to the presumption of innocence and to the state's burden of proving guilt beyond a reasonable doubt, could reasonably have found the defendant guilty, the verdict will not be reversed. *Id.*

### A. Evidence of Intent

■ Appellant argues that the state failed to meet its burden of proving that appellant intended Rodgers' death because there was overwhelming evidence that Rodgers was only to be beaten, and thus his conviction of first-degree felony murder and the jury's finding of guilt on second-degree intentional murder are not supported by the evidence. The state argues that there was sufficient evidence for the jury to find that appellant intended to kill Rodgers. Relying on *State v. Cooper*, 561 N.W.2d 175, 179 (Minn.1997), the state argues that the jury was not bound by statements made before the killing.

■ In order to secure a conviction of either first-degree murder during the commission of an aggravated robbery or second-degree intentional murder, the state had to prove beyond a reasonable doubt each of the following: (1) that appellant caused the victim's death; and (2) that the action taken was with the intent to cause death. *See* Minn.Stat. § 609.185(3); Minn. Stat. § 609.19, subd. 1(1). In order to secure a conviction of first-degree murder during the commission of an aggravated robbery, the state also had to prove a third element, namely, that at the time of the act resulting in death appellant was involved in the act of committing or attempting to commit aggravated robbery. *See* Minn.Stat. § 609.185(3). The legislature has defined what is required when criminal intent is an element of a crime: " 'With intent to' or 'with intent that' means that the actor either has a purpose to do the thing or cause the result specified or believes that the act, if successful, will cause that result." Minn.Stat. § 609.02, subd. 9(4) (2000). Intent to kill may be inferred from the nature of the killing. *State v. Gillam*, 629 N.W.2d 440, 454 (Minn.2001).

Here, the jury found that appellant intended to kill Rodgers. The jury's deter-

mination that appellant intended to cause Rodgers' death is supported by the nature of the killing—multiple blows to the head with a heavy tire jack. In addition, the jury's determination is supported by other circumstantial evidence, including the hostilities leading up to the murder and the remoteness of the area where the murder occurred. There is sufficient evidence to support the jury's determination that appellant caused the death of the victim with intent to effect his death. Thus, there is sufficient evidence to support the jury's verdict that appellant was guilty of second-degree intentional murder. However, appellant's conviction of first-degree felony murder also required the state to prove that at the time of the act resulting in death appellant was involved in the act of committing or attempting to commit aggravated robbery.

### B. During the Commission of an Aggravated Robbery

■ Appellant argues that his conviction of first-degree felony murder must be reversed because there is insufficient evidence to support the jury's finding that the killing occurred during the commission of an aggravated robbery. The state argues that it is irrelevant whether the killing took place before, during, or after the robbery, so long as the murder and robbery were both part of the same chain of events. The state also argues that because the murder and the robbery occurred at the same location and at virtually the same time, the jury was free to infer that killing

Rodgers and removing his identification were part of one continuous transaction. Thus, the state argues that there is sufficient evidence to support the jury's determination that appellant inflicted harm in order to take Rodgers' personal property.

■ "Aggravated robbery" is a simple robbery[2] committed by someone who is armed with a dangerous weapon or any article that the victim would reasonably believe was a dangerous weapon, or by someone who inflicts bodily harm upon another. Minn.Stat. § 609.245, subd. 1 (2000). A conviction for felony murder will be upheld only when the killing and the felony are part of "one continuous transaction." See Kochevar v. State, 281 N.W.2d 680, 686 (Minn.1979). Here, it is not clear that the taking of victim's personal property and the killing were part of one continuous transaction for purposes of Minn.Stat. § 609.185(3). By its plain words, the statute prohibiting first-degree felony murder requires the defendant to have caused the death of the victim while committing or attempting to commit aggravated robbery. Minn.Stat. § 609.185(3). "Whoever does any of the following is guilty of murder in the first degree and shall be sentenced to imprisonment for life: * * * * (3) causes the death of a human being with intent to effect the death of the person or another, while committing or attempting to commit * * * aggravated robbery * * *." Id. The plain language of the statute indicates that it is generally aimed at prohibiting robberies that result in an intentional killing.[3] See id. This is consistent with the

---

**2.** A simple robbery is the taking of another's personal property by force or threat of force and is defined under Minn.Stat. § 609.24 (2000) as follows:

Whoever, having knowledge of not being entitled thereto, takes personal property from the person or in the presence of another and uses or threatens the imminent use of force against any person to overcome

the person's resistance or powers of resistance to, or to compel acquiescence in, the taking or carrying away of the property is guilty of robbery and may be sentenced to imprisonment for not more than ten years or to payment of a fine of not more than $20,000, or both.

**3.** 9A Henry W. McCarr & Jack S. Nordby, *Minnesota Practice Series Criminal Law and*

historical purpose behind the unique category of homicide known as "felony murder," which was to punish an unintentional killing that results from a felony more severely than other unintentional killings in order to deter killings that might occur during the commission of a felony. *See, e.g., People v. Washington,* 62 Cal.2d 777, 44 Cal.Rptr. 442, 402 P.2d 130, 133 (1965); *State v. O'Blasney,* 297 N.W.2d 797, 798 (S.D.1980); *see also* 40 C.J.S. *Homicide* § 45 (1991) ("The ostensible purpose of the felony-murder rule is * * * to deter the negligent or accidental killings that may occur in the course of committing [the underlying] felony, by increasing the penalty for nonpurposeful killings during the commission of certain enumerated felonies by implying * * * premeditation and deliberation.") (footnotes omitted).

Consistent with the language of Minn. Stat. § 609.185(3) and the common law roots of felony murder, we have upheld convictions for first-degree felony murder only when there was sufficient evidence for the jury to find that the defendant had formed intent to commit the underlying felony either prior to or during the commission of the act that resulted in the victim's death. *See, e.g., State v. Harris,* 589 N.W.2d 782, 793 (Minn.1999); *State v. Peou,* 579 N.W.2d 471, 478 (Minn.1998); *State v. Dukes,* 544 N.W.2d 13, 15–16, 20 (Minn.1996) (affirming conviction when appellant shot and killed driver of car appellant was robbing); *State v. Arrendondo,* 531 N.W.2d 841, 843–45 (Minn.1995); *State v. Ouk,* 516 N.W.2d 180, 186 (Minn.1994) (affirming conviction when appellant and others set out to rob gas station and shot and killed two people during the robbery); *State v. Russell,* 503 N.W.2d 110, 112–14 (Minn.1993); *State v. Nielsen,* 467 N.W.2d 615, 618 (Minn.1991); *State v. Bergeron,*

*Procedure* § 49.3 (3d ed. 2001) ("The crime of 'felony' murder involves a killing that re-

452 N.W.2d 918, 925–26 (Minn.1990) (affirming conviction when killing occurred after appellant committed a burglary).

In *Harris,* we affirmed a conviction of felony murder and stated that "the evidence that [the defendant] 'bug[ged]' [the victim] for money earlier in the evening suggests that theft was his primary motive for entering the apartment and not, as [the defendant] asserts, merely an afterthought to the killing." 589 N.W.2d at 793 (second brackets in original). In *Peou,* we concluded that "even though the robbery occurred after the murders, the jury could have believed that [the defendant] entered the store with a motive to commit robbery based upon evidence that he was badly in need of money and that he had quarreled with [the victim] over the value of previously pawned property." 579 N.W.2d at 478. We held that there was no error in the instructions given to the jury regarding the intent required for felony murder when the trial court instructed the jury that the defendant must have been engaging in the act of aggravated robbery or must have been attempting aggravated robbery *at the time of the killings:*

> [T]he trial court instructed the jury that "it does not matter if the aggravated robbery was attempted or committed before, during, or after the death of [the victim], as long as it was done as part of a continuous transaction." The trial court also instructed the jury that [the defendant] must have intended to cause the deaths of the victims and also must have been engaging in the act of committing or attempting to commit the crime of aggravated robbery *at the time of the killings* to be found guilty of this charge.

sults from the commission of another crime * * *.").

*Id.* at 475–76 (emphasis added). We concluded that the trial court's instruction to the jury was a "correct statement of the substantive law." *Id.* at 476.

In *Nielsen*, we affirmed a conviction of first-degree felony murder—where the underlying felony was a sexual assault—because "the jury could have believed that the assault [that resulted in death] was sexually motivated and that the criminal sexual conduct and the homicide were one continuous transaction, making the crime first degree felony murder." *Id.* at 618.

Our decisions are consistent with felony murder as developed at common law and in other jurisdictions:

> The law does not require that the felony necessarily precede the murder in order to support the felony-murder conviction. It is enough that the murder facilitate the felony. However, in order to support a conviction of felony murder the evidence must establish that defendant harbored a felonious intent either prior to or during the commission of the acts which resulted in the victim's death, and evidence which establishes that defendant formed the intent only after engaging in the fatal act cannot support a conviction of felony murder.

40 C.J.S. *Homicide* § 47 (1991) (footnotes omitted).

■ It is true, as the state contends, that the act that constitutes the underlying felony may occur before, during, or after the killing. *See, e.g., Harris*, 589 N.W.2d at 792. However, even though two crimes may have been committed at or about the same time and place, our decisions indicate that the "one continuous transaction" requirement of felony murder will not be satisfied automatically simply because the two events occur near each other in time and place. Instead, we have held that the causal relationship between the murder and the underlying felony is only satisfied when there is evidence to support a finding that the defendant formed the requisite felonious intent before or during the act resulting in death. *See, e.g., Nielsen*, 467 N.W.2d at 618.

Under the facts of this case, the evidence shows that appellant caused the death of the victim and left the scene of the crime for a few moments, driving approximately 50 yards before returning to the body to retrieve the victim's identification. The short period of time and short distance between the two crimes are not enough to sever the single chain of events as pertains to the act of the underlying felony. *See Harris*, 589 N.W.2d at 793. However, a felony murder charge also requires sufficient evidence to support a jury determination that appellant had formed the intent to rob Rodgers by the time he intentionally killed him. *See* Minn.Stat. § 609.185(3); *Peou*, 579 N.W.2d at 475–76; *Nielsen*, 467 N.W.2d at 618.

The state offered no evidence that appellant intended to take the identification before or during the time appellant killed Rodgers. By the state's own theory, the homicide was in retaliation for violating gang rules, and appellant likely returned to retrieve the identification cards either to offer proof of the deed to his fellow Gangster Disciples or to stymie the investigation. But the state offered no evidence that appellant had formed the intent to "rob" Rodgers when he set out either to beat up Rodgers or to kill him. It is at least as likely that appellant determined after he had killed Rodgers to take his identification in order to offer proof to Johnson and the other Gangster Disciples that he had taken care of Rodgers. *See State v. Bias*, 419 N.W.2d 480, 484 (Minn. 1988) (concluding that conviction based on circumstantial evidence merits stricter scrutiny and may stand only when the circumstances proved are consistent with

the hypothesis that the accused is guilty and inconsistent with any rational hypothesis other than that of guilt and form a complete chain that leads so directly to the guilt of the accused as to exclude, beyond a reasonable doubt, any reasonable inference other than that of guilt).

We hold that the state failed to produce sufficient evidence that appellant had formed the intent to rob Rodgers at or before the time of the killing. Thus, the state failed to prove beyond a reasonable doubt that appellant caused the victim's death "while committing an aggravated robbery." We therefore reverse appellant's conviction of first-degree murder during the commission of an aggravated robbery.

## II.

■ Appellant further claims that the trial court committed reversible error when it instructed the jury on a defendant's right not to testify on his own behalf without explaining to appellant the significance of the instruction and without getting appellant's permission on the record for the jury to be so instructed.[4] Appellant claims that the error entitles him to a new trial.

The trial court erred in giving the jury instruction on a defendant's right not to testify without appellant's permission on the record. *State v. Thompson,* 430 N.W.2d 151, 153 (Minn.1988); *see also* Minn.Stat. § 611.11 (2000) ("[A defendant's] failure to testify shall not create any presumption against the defendant, nor shall it be alluded to by the prosecut-

ing attorney *or by the court.*") (emphasis added).

However, appellant did not object to the jury instruction that was given. Therefore, before we will review the giving of the instruction, three factors must be satisfied: (1) there must have been error (2) that was plain and (3) that affected substantial rights. *State v. Griller,* 583 N.W.2d 736, 740 (Minn.1998). The defendant bears a heavy burden of showing that substantial rights have been affected. *Id.* at 741. In *Griller,* we stated that plain error is prejudicial when there is a reasonable likelihood that the giving of the instruction would have had a significant effect on the jury's verdict. *Id.*

Here, giving the instruction without appellant's permission on the record was error. *See Thompson,* 430 N.W.2d at 153. However, we have held the giving of this jury instruction to be harmless. *See Thompson,* 430 N.W.2d at 153; *State v. Rosen,* 280 Minn. 550, 550–51, 158 N.W.2d 202, 202 (1968) (per curiam); *see also State v. Sandve,* 279 Minn. 229, 233–34, 156 N.W.2d 230, 233–34 (1968). Appellant has not shown that the facts of this case make the error prejudicial, nor has appellant met his heavy burden of showing that there is a reasonable likelihood that giving the instruction had a significant effect on the jury's verdict. We therefore conclude that, while it was error for the trial court to give an instruction on appellant's right not to testify without appellant's permission on the record, the error was not prej-

---

4. The instruction that the court gave the jury on a defendant's right not to testify was CRIMJIG 3.17, which provides:

    The State must convince you by evidence beyond a reasonable doubt that the defendant is guilty of the crime charged. The defendant has no obligation to prove innocence. The defendant has the right not to

testify. This right is guaranteed by the federal and state constitutions. You should not draw any inference from the fact that the defendant has not testified in this case. 10 Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides, Criminal,* CRIMJIG 3.17 (4th ed.1999).

udicial and does not entitle appellant to a new trial.

### III.

 The final issue raised by appellant is whether the state committed prosecutorial misconduct during its closing argument. Appellant contends that the state committed misconduct by saying to the jury, "so I need not say to you what I might want to say to another jury, that a conviction on second degree murder unintentional alone might be tempting because it's easy and it's a compromise," arguing that this was an improper attempt to influence the jury by implying that the jury was more intelligent or had a better sense of justice than an average jury. Appellant also argues that the state committed misconduct by the following argument: "We have proven our case beyond a reasonable doubt and it's fair and just. You should come back with verdicts of guilty. Justice requires those verdicts. Justice in the abstract sense that we use the word. Justice for society. And yes, justice for Cornelius Rodgers * * *." Appellant argues that this argument was improper because the prosecutor is not permitted to appeal to the passion and prejudice of law and order.

 Appellant failed to object to the alleged misconduct and failed to seek a cautionary instruction. It is well-established that a defendant who fails to object to a prosecutor's statements or to seek specific cautionary instructions is deemed to have forfeited the right to have the issue considered on appeal, although the reviewing court may reverse despite the defendant's failure to preserve the issue if the court deems the error sufficient to do so. *State v. Whittaker,* 568 N.W.2d 440, 450 (Minn.1997); *State v. Brown,* 348 N.W.2d 743, 747 (Minn.1984); *State v. Gunn,* 299 N.W.2d 137, 138 (Minn.1980). We conclude that appellant has forfeited his right to have this issue considered on appeal and we decline to reach the issue.

In addition to first-degree murder during the commission of an aggravated robbery, the jury returned verdicts of guilty of second-degree intentional murder and second-degree murder during the commission of an assault. We have concluded that there was sufficient evidence to support the jury's determination that appellant caused Rodgers' death with intent to effect his death. Thus, the evidence supports the jury's verdict that appellant was guilty of second-degree intentional murder in violation of Minn.Stat. § 609.19, subd. 1(1). We therefore remand for entry of conviction on second-degree intentional murder and for resentencing.

Affirmed in part, reversed in part, and remanded for resentencing.