STATE of Minnesota, Respondent,

v.

Bruce (NMN) HARRIS, Appellant.

No. C8–97–496.

Supreme Court of Minnesota.

Jan. 7, 1999.

John M. Stuart, State Public Defender, Leslie J. Rosenberg, Special Assistant State Public Defender, Minneapolis, for appellant.

M. Hatch, Attorney General, St. Paul, Michael O. Freeman, Hennepin County Attorney, Linda K. Jenny, Assistant County Attorney, Minneapolis, for Respondent.

## OPINION

PAUL H. ANDERSON, Justice.

Appellant Bruce Harris was found guilty by a jury of one count of first-degree murder while committing or attempting to commit criminal sexual conduct and one count of first-degree murder while committing or attempting to commit aggravated robbery for the 1995 killing of Carolyn McGrath. On appeal, Harris alleges that his conviction should be reversed for the following reasons: (1) the district court erred in admitting evidence seized during a search of Harris' apartment because the warrant authorizing that search was not supported by probable cause; and (2) there was insufficient evidence for the jury to find Harris guilty of either count of felony-murder. We affirm.

On the morning of December 12, 1995, Minneapolis police officers were called to the Minneapolis apartment of Carolyn McGrath by McGrath's grandson. The grandson had gone to the apartment to drop off his younger sister whom McGrath routinely babysat during the hours before school started. When McGrath failed to answer her door, her grandson became worried and called the police. At approximately 6:30 a.m., the police arrived and, after entering McGrath's apartment, discovered 63–year–old McGrath dead in her bedroom. The police found McGrath lying on her bed in her nightclothes with a pillow covering her face. McGrath's

underpants were torn and both of her legs were through the same leg hole of the underpants. She had sustained multiple "sharp-force" injuries to the front of her torso. In McGrath's bedroom, the police found a 3- to 4-inch kitchen knife and a large, two-pronged meat fork with the handle bent nearly in half. Both items had blood on them. The police also found a pair of blue, blood-stained gloves and a dark knit stocking cap in the bedroom.

Dr. Mitchell Morey, an Assistant Hennepin County Medical Examiner, conducted an autopsy of McGrath's body. The autopsy revealed that the sharp-force injuries to McGrath's torso were consistent with having been caused by the knife and the meat fork found in McGrath's bedroom. The examiner also discovered indicia of asphyxiation and strangulation. The examiner concluded that McGrath's death was caused by a combination of the sharp-force wounds, asphyxiation, and strangulation. He estimated that McGrath was killed between 8:30 p.m. on December 11 and 2:30 a.m. on December 12, 1995.

In conducting his autopsy, the medical examiner also discovered a pair of "superficial tears" in the lining of McGrath's vagina. While no sperm or seminal fluid was discovered on McGrath's body or clothes, the examiner did discover three black hairs on McGrath's vaginal area. Macroscopic examination tests revealed that the hairs were pubic hairs from a person who was African–American. McGrath was Caucasian. Based on this evidence and the nature of McGrath's other injuries, the examiner concluded that McGrath had been sexually assaulted at or about the time of her death.

The police interviewed Joyce and Kellie Rooker, two friends of McGrath, who reported that they spent part of the evening of December 11, 1995 at McGrath's apartment watching a video. At trial, the Rookers testified that they arrived at McGrath's apartment between 5:00 and 5:30 p.m. At about 6:20 p.m., there was a knock at McGrath's door and McGrath answered it. After a few seconds, McGrath returned to the room and said that the visitor had been Bruce Harris, who lived in the apartment next door. At

trial, it was undisputed that McGrath knew Harris, that the two were friends, and that McGrath would typically let Harris into her apartment. The Rookers further testified that, between 15 and 30 minutes after the first visit, Harris visited McGrath a second time and, once again, left after having a short conversation with her. Joyce Rooker testified that, upon returning to the apartment, McGrath said that Harris had been trying to collect some money McGrath owed him. Kellie Rooker testified that McGrath then said that Harris might stop "bugging" her because McGrath had told him she had no money. The Rookers left McGrath's apartment at approximately 7:30 p.m.

The police also interviewed McGrath's daughter, who reported that some items were missing from McGrath's apartment, including a VCR, jewelry, the keys to the apartment, and the magnetic key card for the apartment building's front security door. McGrath's daughter testified that, although McGrath had numerous physical ailments, including arthritis, for which she took prescription medication, after McGrath's death, the only pill bottles found in her apartment were empty.

During the course of their investigation, the police examined surveillance videos from security cameras positioned at the entryway of McGrath's apartment building. The videos from December 11 and 12, 1995 showed that Harris made multiple trips into and out of the building around the time of McGrath's killing, often carrying boxes or bags filled with unidentifiable objects.

On the same day the police found McGrath's body, they attempted to contact Harris. Residents of McGrath's apartment informed the police that they had not seen Harris. The police continued to look for Harris and returned to the apartment building approximately six times between December 12 and 22, 1995. During those trips, the police saw no signs of activity in Harris' apartment and observed that numerous flyers were piling up in front of Harris' door.

On December 22, 1995, the police contacted Harris' fiancé, Marlene Cornelius. Cornelius did not tell the police where Harris

was, but said that Harris had visited her on December 12, 1995 at approximately 6:30 a.m.—about the same time the police were first entering McGrath's apartment—and, at that time, Harris told her that McGrath was dead. At trial, however, Cornelius testified that, while Harris did visit her on the morning of December 12, he did not tell her that McGrath was dead until later, after he learned it from another friend.

According to Cornelius, when Harris visited her on the morning of December 12, he appeared to be intoxicated, was vomiting, and said that he had taken four Actifed. Forty to forty-five minutes after Harris' arrival, Cornelius left her home and walked four blocks to the Hennepin County Medical Center (HCMC) where she participated in chemical dependency treatment classes. Harris followed Cornelius to HCMC. Once there, Cornelius informed nurses that Harris had ingested some pills. Harris vomited and, in the vomit, HCMC's staff discovered that Harris had taken over 40 pills of various types. Among the substances ingested by Harris were cocaine, acetaminophen, and Voltaren, a prescription arthritis medication. Harris was admitted to the psychiatric ward of HCMC and stayed there until December 21, 1995 when he was transferred to an inpatient chemical rehabilitation treatment center. Although Cornelius knew that Harris was at the inpatient treatment center at the time of her initial interview with the police, at that time she did not tell the police where Harris was. Cornelius did, however, agree to come to the police station the following day to provide a statement.

On the same day they first interviewed Cornelius, December 22, 1995, the police applied for a warrant to search Harris' apartment. The police prepared an affidavit in support of their application and presented it to a Hennepin County district court judge. In pertinent part, the affidavit stated:

> You affiant interviewed two of the victim;s friends who had last seen her on 12–11–95 at approx. 7p.m. to 8p.m. they had been watching a video movie with her and during the course of the movie they heard a knock at the door. the victim got up to answer the door and then stepped into the hallway to talk with an unkown party who had interrupted the movie session. According to one of the parties, the victim came back into the apt. and seemed to be fine showing no signs of agitation at being interrupted. Aprox.10 to 15 minutes later ther was another knock at the door and again the victim got up and went to the door. this time the party who knocked came into the apt. once the door had been opened. The victim's friend recognized the party as Bruce the occupant of apt. # 903 jist down the hall from the victim. The victim then took Bruce out into the hallway and spoke to him, when the victim returned one of the quest recall the vicitm stating that he might not bug me for a while after this visit.

> Your affiant also learned that the resident of apt.# 903 did not use he keycard for access to the security door to the apt. bldg. but used the keypad and punched in a code for another apt. to enter into the bldg. Your affiant learned that a video tape for the bldg. front door as well as the interior area's and the exits had been turned over too other investigators. Upon learning this your affiant had two other tenants of the bldg view the tape to determine the ID of the party using the front door who had what appeared to be two boxes and some-type of bag with what appeared to be a flower designon it being let into the bldg and leaving approx.10 minutes later with whatappeared to be heavy items inside of the flowered designed bag and carrying the two boxes under his arm. Both of these parties viewed the tape and immediatley recognized the individual as the occupant of apt. # 903.

> Your affiant has been back to the apt. bldg numerous times trying to locate the renter of apt. # 903 and has not been able to make contact with them. It has b been noted that there are numerous flyers on the door that have not been picked up and there has been no sign of any acitivity in the apt, since thelease was last seen on the 11th of Dec.

> \*    \*    \*    \*    \*    \*

> Your affiant learned that a DAEWOO brand V.C.R. was missing along with misc.

jewerly items and the apt. key and keycard that belonged to the victim.

(Errors in original.) Based solely on the information contained in the affidavit, the judge issued a warrant to search Harris' apartment.

The warrant authorized the police to search Harris' apartment for jewelry, McGrath's key and key card, the VCR, proof of Harris' residency, and blood-stained clothes. The police executed the warrant on December 22, 1995, after their interview with Cornelius. In Harris' apartment, the police found and seized six empty prescription bottles with McGrath's name on the labels. Between the mattress and box spring of Harris' bed, the police found and seized a set of keys, which, when tested, fit into McGrath's apartment door. In the same location, the police found and seized a magnetic key card for the front entryway of the apartment building. The police also seized "numerous papers" identifying Harris as the resident of the apartment, including Harris' phone bill.

On December 23, 1995, Cornelius went to the police station to give a statement. During the interview, the police showed Cornelius a photograph of the gloves found in McGrath's apartment. Cornelius identified the gloves as belonging to Harris. Cornelius then told the police that Harris was at the inpatient treatment center. The police arrested Harris outside of the center on December 26, 1995.

Subsequent DNA tests indicated that the gloves found in McGrath's apartment had been worn by Harris. The blood on the gloves, as well as the blood on the knife and meat fork found in McGrath's apartment, matched McGrath's. Examination of hair fragments from the knit stocking cap found in McGrath's apartment showed the fragments to be hairs from a person who was African–American. Harris is African–American.

Harris was indicted on January 23, 1996 and charged with one count of first-degree murder while committing or attempting to commit criminal sexual conduct and one count of first-degree murder while committing or attempting to commit aggravated robbery. At a *Rasmussen* hearing, the defense moved to suppress the evidence seized in the search of Harris' apartment, arguing that the search warrant lacked the probable cause support required by the Fourth Amendment to the United States Constitution. While the presiding judge acknowledged that the affidavit supporting the warrant "was probably one of the most poorly written and least supported that this Court has ever reviewed and sustained," the presiding judge upheld the issuing judge's finding of probable cause.

At trial, Harris denied killing McGrath. Harris testified that, on the night of the killing, he had given his hat and gloves to an acquaintance, a purported drug runner known only as Ali. Harris opined that Ali must have killed McGrath and hidden the pill bottles in Harris' apartment. Harris also testified that, after Ali left Harris' apartment, Harris became despondent over his inability to stop using cocaine and attempted to commit suicide by taking every pill he could locate in his apartment. Harris said that he must have found and consumed McGrath's pills without realizing their source.

The jury found Harris guilty of both counts of felony-murder. The court sentenced Harris to life in prison for the first count. On appeal, Harris asks that we reverse his conviction, claiming that the district court erred in admitting the evidence seized from Harris' apartment because the warrant authorizing the search was not supported by probable cause. Harris also asserts that there was insufficient evidence for the jury to find him guilty of either felony-murder charge.

I.

A search warrant may be issued only upon a finding of probable cause by a neutral and detached magistrate. *See* Minn. Stat. § 626.08 (1996). Accord U.S. Const. Amend. IV, Minn. Const. art. I, § 10. In determining whether a warrant is supported by probable cause, however, we do not review the lower court's decision de novo. Rather, we afford "great deference" to the issuing judge's finding of probable cause. *State v. Souto*, 578 N.W.2d 744, 747 (Minn.

1998). Our review is limited to ensuring that "the issuing judge had a 'substantial basis' for concluding that probable cause existed." *State v. Zanter*, 535 N.W.2d 624, 633 (Minn. 1995) (citing *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)).

■ In the present case, Harris argues that the factual allegations contained in the police affidavit supporting the warrant to search his apartment were insufficient to support the issuing judge's finding of probable cause. Specifically, Harris alleges that "the allegations in the affidavit did not connect [Harris] to the crime." We disagree.

Although the affidavit is not a model of specificity, it did contain the following factual allegations: (1) McGrath was killed in her apartment building on December 11 or 12, 1995; (2) keys, a key card, and a VCR were missing from McGrath's apartment; (3) Harris visited McGrath at approximately 7:00 to 8:00 p.m. on December 11, 1995; (4) after Harris left, McGrath said she felt that Harris might not "bug" her any more; (5) at an unspecified time, Harris used the key pad rather than a key card to access the apartment building's security door; (6) at an unspecified time, Harris was seen carrying a bag filled with heavy items out of the apartment building; and (7) in the ten days following McGrath's killing, the police returned to Harris' apartment numerous times but saw no signs of activity in the apartment.

■ Harris correctly argues that none of these allegations prove that evidence of the crimes would be found in Harris' apartment. However, in reviewing the issuing judge's decision, we "must be careful not to review each component of the affidavit in isolation. Even if each component is judged unsubstantial, the components viewed together may reveal * * * 'an internal coherence that [gives] weight to the whole.'" *Wiley*, 366 N.W.2d at 268 (quoting *Massachusetts v. Upton*, 466 U.S. 727, 734, 104 S.Ct. 2085, 80 L.Ed.2d 721 (1984)).

■ The task of the issuing judge charged with determining whether probable cause to search exists "is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238, 103 S.Ct. 2317; *see also Zanter*, 535 N.W.2d at 633. "Among the factors considered in determining whether there is a sufficient showing of probable cause to believe that items will be found in a particular place are the type of crime, the nature of the items sought, the extent of the suspect's opportunity for concealment, and the normal inferences as to where the suspect would normally keep the items." *State v. Pierce*, 358 N.W.2d 672, 673 (Minn.1984).

■ Here, the affidavit states that the police were searching for documentation that Harris resided in the apartment and, to that end, the police eventually seized numerous papers, including a phone bill, showing Harris' residency. Common sense permits an inference that such documents would normally be found in a person's home. *See State v. Wiley*, 295 Minn. 411, 417, 205 N.W.2d 667, 673 (1973) ("In passing on an application for a warrant, the magistrate is not required to ignore such familiar facts of normal life as the habit of most people to have items of identification at their residence.").

The police were also seeking "blood stained clothing." Under normal circumstances, one's home is the most likely place that one would change clothes and clean up. Here, the likelihood that Harris would have returned to his apartment to change and wash is increased by the fact that his apartment was next door to the scene of the crime.

The proximity of Harris' apartment to the crime scene also increases the probability that some of the items stolen from McGrath's apartment would be found in Harris' apartment. Because only a few hours passed between the time McGrath was killed and the time the police began searching for Harris, it is entirely reasonable to assume that Harris may not have had the time or opportunity to sell, consume, or otherwise dispose of all of the items taken from McGrath's apartment. Because Harris' apartment was next door to the scene of the crime, it would have been

the most convenient place for him to conceal any contraband. *See Rosillo v. State*, 278 N.W.2d 747, 749 (Minn.1979) (recognizing that the "normal place" a defendant would be expected to keep stolen property he could not carry would be his residence). Thus, the very nature of the items sought reasonably permitted an inference that, if Harris was McGrath's killer, there was a fair probability that the items would be found in his apartment.

The crux of Harris' argument, however, is not that the affidavit contained insufficient information to permit an inference that the items sought would be found in his apartment if, indeed, he was McGrath's killer. Rather, Harris contends that the factual allegations contained in the affidavit were insufficient to support a finding of probable cause to believe that he killed or robbed McGrath. Without a nexus linking him to the crimes, Harris alleges, the police had no cause to search his apartment.

We addressed a similar argument in *State v. Souto*, 578 N.W.2d 744 (Minn.1998). In *Souto*, the state argued that its search warrant application showed that Souto was a "drug trafficker," and that such a showing alone was sufficient to establish probable cause to search Souto's residence for drugs. *Id.* at 748. We did not dispute that, under certain circumstances, it may be permissible for a magistrate to infer that drugs would be found in the home of a "drug wholesaler." *Id.* at 748; *see Novak v. State*, 349 N.W.2d 830, 832 (Minn.1984). We concluded, however, that the state's warrant application failed to show that Souto was anything more than a casual user of drugs and contained no timely information that Souto had ever possessed or used drugs at her residence. *Souto*, 578 N.W.2d at 748. Accordingly, we held that the affidavit was insufficient to support a finding of probable cause to search Souto's residence. *Id.* at 749.

In the present case, however, the affidavit's allegations and the reasonable inferences to be drawn therefrom do sufficiently link Harris to the killing and robbery of McGrath. Here, the affidavit contains statements from two eyewitnesses, identified as "friends of the victim," who offered a first-hand, detailed narrative placing Harris in McGrath's apartment on the night of the murder. We have recognized that statements from citizen witnesses, as opposed to criminal informants, may be presumed to be credible. *State v. Buchholtz*, 295 N.W.2d 629, 632 (Minn.1980). From this narrative, the issuing judge could reasonably have inferred that Harris was in the building on the evening McGrath was killed, was able to gain access to McGrath's apartment, and, therefore, had the opportunity to kill McGrath.

In addition, the affidavit's allegation recounting Harris' visit to McGrath's apartment indicates that McGrath felt "bug[ged]" by Harris' visits. While the affidavit does not reveal the reason for or the level of McGrath's annoyance, the mere fact that she used the term "bug" suggests that McGrath felt at least some amount of irritation at Harris on the night she was killed.

The affidavit also alleges that the apartment building's security video showed Harris leaving the building carrying a bag filled with heavy items. The district court concluded that this allegation supported an inference that "Harris was seen leaving the building with a bag that could have been carrying a VCR taken from the victim." Harris argues that, because the affidavit fails to specify a time period in which this action occurred, no such inference can be drawn from it.

In the past, we have expressed "strong disapproval of the omission of time from an affidavit in support of a search warrant application." *State v. Rosenthal*, 269 N.W.2d 40, 41 n. 2 (Minn.1978). However, under the totality of the circumstances test, such an omission is not per se fatal. *See generally*, 2 Wayne R. LaFave, *Search & Seizure*, § 3.7(b) (3d ed.1996). Here, the approximate timing of the actions depicted in the video may reasonably be inferred from the context of the affidavit. The affidavit indicates that McGrath was alive at approximately 8:00 p.m. on December 11, 1995, and that her body was found on the morning of December 12, 1995. The affidavit implies that, in this period of time, McGrath was killed and that several possessions, including a VCR, were stolen from her apartment. Common sense would suggest that, to have

any relevance at all, the surveillance video must have captured Harris exiting the building after the robbery and killing. The affidavit then alleges that Harris had not been seen after December 11, 1995. Given this contextual information, the issuing judge could reasonably infer an approximate time frame for the actions depicted in the surveillance video.

We do agree, however, with Harris' assertion that few, if any, rational inferences can be drawn from the affidavit's allegation concerning Harris' use of the key pad rather than a key card to access the security door of the apartment building. Arguably, this allegation was intended to show that Harris was in need of a key card, one of the items missing from McGrath's apartment after the killing. However, not only does the allegation concerning the key card not provide a source for the information, but we do not know when or how often Harris supposedly used the key card.

Unlike the allegations concerning the actions depicted in the surveillance video, the allegations concerning Harris' use of the key pad, to be relevant, must have occurred sometime prior to the killing and robbery. Yet, even if it was reasonable for the issuing judge to infer that Harris was without a key card at some point prior to the commission of the crimes, there is nothing in the affidavit from which he could infer a more specific time frame. From the context of the affidavit, we are unable to ascertain whether Harris' use of the key pad rather than a key card was anything more than a one-time event and, further, we have no idea how long ago it occurred. Without more contextual information, there is a genuine concern that this information may be stale or simply irrelevant. Therefore, we conclude, as did the district court, that this allegation provides little if any support for the existence of probable cause.

We reach a different conclusion, however, with respect to the affidavit's allegation that the police made "numerous" attempts to contact Harris in the ten days following the discovery of McGrath's body, but saw no signs of activity in Harris' apartment. While the record indicates that the real reason Harris was not at his apartment during that time was that he was in the psychiatric ward at HCMC, this fact was unknown to either the police or the issuing judge at the time the warrant was issued. On the other hand, from the surrounding allegations in the affidavit, the issuing judge did have evidence that Harris had irritated McGrath on the night she was killed and robbed and that, later that same night, Harris had carried bagged, heavy objects from the apartment building. In light of this knowledge, it would have been entirely reasonable for the issuing judge to infer that Harris' disappearance on the very night McGrath was killed and robbed, coupled with his failure to return home over the next ten days, was an attempt to flee or evade police. We have recognized in the past that "evidence of flight suggests consciousness of guilt." *State v. Bias,* 419 N.W.2d 480, 485 (Minn.1988).

In sum, the affidavit's factual allegations support the following indicia that Harris was McGrath's killer: (1) Harris had the opportunity to kill McGrath and the ability to gain access to her apartment; (2) Harris had irritated McGrath on the night she was killed; (3) sometime after the killing and robbery took place, Harris carried a bag filled with what could have been McGrath's stolen property from the apartment building; and (4) Harris disappeared on the night of the killing, and, despite numerous attempts to find him, the police were unable to locate Harris for the next ten days, suggesting that Harris may have fled.

Harris continues to argue that, even if the above inferences are legitimate, the affidavit still fails to prove that Harris killed McGrath or even that it was more likely than not that Harris killed McGrath. Harris' argument, however, misstates the evidentiary burden necessary to establish probable cause. The evidence necessary to support a finding of probable cause is significantly less than that required to support a conviction. *Gates,* 462 U.S. at 235, 103 S.Ct. 2317; *State v. Carlson,* 267 N.W.2d 170, 173–74 (Minn. 1978). Unlike proof beyond a reasonable doubt or preponderance of the evidence, "probable cause requires only a probability or substantial chance of criminal activity, not

an actual showing of such activity." *Gates*, 462 U.S. at 244 n. 13, 103 S.Ct. 2317.

Even in the context of an arrest warrant where establishing a nexus between the person to be arrested and the crime is the primary issue, we do not require that the affidavit prove that the person committed the crime or even that it show it was more likely than not that the person committed the crime. Rather, "[p]robable cause [to arrest] exists where the facts would lead a person of ordinary care and prudence to entertain an honest and strong suspicion that the person under consideration is guilty of a crime." *Carlson*, 267 N.W.2d at 173. Here, where establishing a nexus between Harris and the crime is necessary to show a probability that the sought-after items would be found in Harris' apartment, we will require no greater burden.

■■■ "Reasonable minds frequently may differ on the question of whether a particular affidavit establishes probable cause * * *." *United States v. Leon*, 468 U.S. 897, 914, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). We acknowledge that the affidavit at issue presents a close question. This prompts us to remind law enforcement officers that issues such as this can be avoided if they take care in drafting supporting affidavits by: providing specific sources for their allegations; naming those sources when possible or explaining who those sources are when their names are unknown or confidential; indicating the exact date and time an alleged event occurred; and providing some explanation for the relevance of each allegation. But we are also mindful that warrant affidavits are typically drafted by "non-lawyers in the midst and haste of a criminal investigation." *Gates*, 462 U.S. at 235, 103 S.Ct. 2317. Therefore, we cannot hold warrant applications to the strict standards we require for pleadings.

■■■ The purpose of a warrant is not to determine guilt or innocence, but to ensure that the sufficiency and validity of the evidence supporting the search has been evaluated and confirmed by a neutral, detached party. To ensure that the warrant requirement does not become so burdensome as to discourage the police from seeking review by such a neutral party, "the resolution of doubtful or marginal cases should be 'largely determined by the preference to be accorded warrants.'" *Wiley*, 366 N.W.2d at 268 (quoting *Upton*, 466 U.S. at 734, 104 S.Ct. 2085). Accordingly, we affirm the district court's finding of probable cause.[1]

## II.

■■■ Harris next alleges that the evidence presented at trial was insufficient for the jury to have found him guilty of either count of first-degree felony-murder. In analyzing a challenge to the sufficiency of the evidence, we review the record to determine "whether the evidence, when viewed in a light most favorable to the conviction, was sufficient to permit the jurors to reach the verdict which they did." *State v. Webb*, 440 N.W.2d 426, 430 (Minn.1989). In so doing, we assume that "the jury believed the state's witnesses and disbelieved any evidence to the contrary." *State v. Moore*, 438 N.W.2d 101, 108 (Minn.1989). Our review is "limited to ascertaining whether a jury, giving due regard to the presumption of innocence and to the state's burden of proof beyond a reasonable doubt, could reasonably conclude that the defendant was guilty based on the facts in the record and any legitimate inferences therefrom." *State v. Wallace*, 558 N.W.2d 469, 472 (Minn.1997).

■■■ In the present case, Harris was found guilty of two counts of felony-murder under Minn.Stat. §§ 609.185(2) and (3) (1994). Section 609.185(2) requires the state to prove beyond a reasonable doubt that the defendant caused the death of a human being "while committing or attempting to commit criminal sexual conduct in the first or second degree with force or violence." Section 609.185(3) requires the state to prove that the defendant caused the death of a human

---

1. Because we affirm the district court's conclusion that the search warrant was supported by probable cause, we need not address the state's request for us to adopt the "good faith" exception to the warrant requirement recognized by the U.S. Supreme Court in *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). Nor do we address the state's claims that admission of the seized evidence was, in any event, harmless error.

being "with intent to effect the death of the person * * *·while committing or attempting to commit * * * aggravated robbery." To establish the necessary nexus between the killing and the underlying felony, the state must prove that "the 'fatal wound' was inflicted during the same 'chain of events' [in which the underlying felony took place] so that the requisite time, distance, and causal relationship between the felony and killing are established." *State v. Russell,* 503 N.W.2d 110, 113 (Minn.1993) (citing 2 Wayne R. LaFave & Austin W. Scott, Jr., *Substantive Criminal Law,* § 7.5(f) at 223 n. 88 (1986)). So long as the underlying felony and the killing are part of one continuous transaction, it is irrelevant whether the felony took place before, after, or during the killing. *See State v. Peou,* 579 N.W.2d 471, 475–76.

█ With respect to McGrath's killing, the police and the medical examiner testified that McGrath's death was a homicide. Furthermore, McGrath's friends and relatives and Harris himself testified that McGrath knew Harris and would typically let him into her apartment, even late at night. The blood-stained gloves found in McGrath's apartment were identified as belonging to Harris and contained DNA that matched Harris', further linking Harris to the crime. Moreover, macroscopic tests could not exclude Harris as the source of the hair fragments found on McGrath and in the stocking cap found in McGrath's apartment. In addition, Harris told his fiancé that McGrath was dead even before the police found McGrath's body. The fact that items from McGrath's apartment were subsequently found in Harris' apartment further connects Harris to the scene of the crime. We hold that the jury could reasonably draw enough legitimate inferences from this evidence to conclude beyond a reasonable doubt that Harris killed McGrath.

We also hold that the evidence was sufficient to prove that Harris sexually assaulted McGrath. Evidence of the manner in which a crime was committed, including the type of wounds the victim sustained and the condition and posture of the victim's body, can support a conclusion that the victim was killed while being sexually assaulted. *See*

*State v. Pilcher,* 472 N.W.2d 327, 336 (Minn. 1991). Here, the medical examiner testified that McGrath had vaginal injuries consistent with penetration by a small object. The examiner found several foreign pubic hairs on McGrath's vaginal area and observed that McGrath's underpants were torn and both of her legs were through the same leg hole of her underpants. The fact that McGrath had been beaten, stabbed, asphyxiated, and strangled strongly suggests that any sexual contact that did occur was not consensual. The same evidence linking Harris to McGrath's killing also supports a conclusion that Harris committed the sexual assault.

Moreover, the state's evidence is sufficient to prove that Harris killed McGrath *while* committing or attempting the sexual assault. Both crimes occurred in McGrath's apartment within a time frame of only several hours. The medical examiner testified that the fact that the foreign pubic hairs were still on McGrath's vagina indicated that she had not engaged in excessive activity after she was assaulted. Furthermore, McGrath's stab wounds were all to her front torso, and the pillow that likely had been used to asphyxiate McGrath was still covering McGrath's head when the police discovered her body. Both of these facts indicate that these fatal wounds were inflicted while McGrath was lying on her back on her bed. Such evidence led the medical examiner to testify that, to a reasonable degree of medical certainty, McGrath had been sexually assaulted at or about the time of death. This evidence is sufficient to support the jury's conclusion that Harris killed McGrath while committing or attempting sexual assault.

█ The state's evidence also was sufficient to support the jury's verdict that Harris was guilty of murder committed during the course of an aggravated robbery. The record clearly supports a conclusion beyond a reasonable doubt that Harris stole several items from McGrath's apartment. Many of McGrath's missing items were found in Harris' apartment. Staff members from HCMC found that Harris had ingested drugs of the same type as those missing from McGrath's apartment. Furthermore, the DNA evidence on the gloves found in McGrath's apartment linked Harris directly to the crime scene.

Harris, however, argues that the evidence offered by the state was insufficient to support a conclusion that he killed McGrath *while* committing or attempting to commit aggravated robbery as required by Minn. Stat. § 609.185(3). Contrary to Harris' claims, however, the evidence shows that the location of the theft and the killing were the same and both crimes were committed within the course of several hours. Furthermore, the evidence that Harris "bug[ged]" McGrath for money earlier in the evening suggests that theft was his primary motive for entering the apartment and not, as Harris asserts, merely an afterthought to the killing. This evidence is sufficient to establish the requisite time, place, and causal relationship between the killing and the theft, such that the jury could have concluded beyond a reasonable doubt that Harris killed McGrath while committing or attempting to commit an aggravated robbery. Accordingly, we hold that the evidence was sufficient to support the jury's verdict.

Affirmed.

PAGE, Justice (dissenting).

I respectfully dissent. The factual allegations of a search warrant application must "establish a direct connection between the alleged criminal activity and the site to be searched."[1] On the facts presented here, I do not believe that the search warrant application and supporting affidavit establish the required "direct connection" between the murder of Carolyn McGrath and the place to be searched. Moreover, the factual allegations contained in the affidavit would not lead a reasonable person to believe that there was a "fair probability" that evidence of the crime would be found in Harris' apartment.[2] I would hold that the items seized during the search of Harris' apartment should have been suppressed.

Therefore, I dissent.

---

1. *State v. Souto,* 578 N.W.2d 744, 749 (Minn. 1998).

2. *State v. Zanter,* 535 N.W.2d 624, 633 (Minn. 1995) (citing *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)).