STATE OF MINNESOTA

IN SUPREME COURT

A22-1281

Hennepin County                                                    Per Curiam

State of Minnesota,

      Respondent,

vs.                                                         Filed: March 20, 2024
                                                   Office of Appellate Courts
Lyndon Akeem Wiggins,

      Appellant.

_____

Keith Ellison, Attorney General, Saint Paul, Minnesota; and

Mary F. Moriarty, Hennepin County Attorney, Adam E. Petras, Assistant County Attorney, Minneapolis, Minnesota, for respondent.

Robert D. Richman, Saint Louis Park, Minnesota, for appellant.
_____

S Y L L A B U S

1.     The district court did not abuse its discretion by denying the defendant's pretrial motion to suppress the cell-site location information for his cell phone because the facts alleged in the warrant application established probable cause to search the cell-site location information records of the defendant's cell phone carrier.

2.      The district court abused its discretion by giving erroneous jury instructions on accomplice liability, and the error was not harmless because it cannot be said beyond a reasonable doubt that the error had no significant impact on the verdict.

Reversed and remanded.

O P I N I O N

PER CURIAM.

Following a jury trial, appellant Lyndon Akeem Wiggins was convicted of first-degree premeditated murder, attempted first-degree premeditated murder, first-degree intentional murder while committing a felony (kidnapping), and kidnapping, all premised on aiding-and-abetting theories of criminal liability. The convictions related to the kidnapping and murder of realtor Monique Baugh in a scheme involving Wiggins, his girlfriend Elsa Segura, Cedric Berry, and Berry Davis.[1] On direct appeal, Wiggins asserts

---

[1]      Wiggins was tried separately from Berry, Davis, and Segura. Berry and Davis had their trials joined, and both were found guilty by the jury of first-degree premeditated murder, attempted first-degree premeditated murder, first-degree felony murder, and kidnapping. *See State v. Berry*, 982 N.W.2d 746 (Minn. 2022); *State v. Davis*, 982 N.W.2d 716 (Minn. 2022). The details of the underlying crimes are discussed in fuller detail in Berry's and Davis's direct appeals. *Berry*, 982 N.W.2d at 750–54; *Davis*, 982 N.W.2d at 721–22. On direct appeal, we affirmed their convictions for first-degree premeditated murder, attempted first-degree premeditated murder, and kidnapping on direct appeal. *Berry*, 982 N.W.2d at 761; *Davis*, 982 N.W.2d at 729. Following a separate trial, Segura was convicted for first-degree premeditated murder, attempted first-degree premeditated murder, first-degree intentional murder while committing a felony (kidnapping), and kidnapping to commit great bodily harm or terrorize, all premised on aiding-and-abetting theories of criminal liability. *State v. Segura*, 2 N.W.3d 142, 149 (Minn. 2024). We reversed Segura's convictions for kidnapping to commit great bodily harm or terrorize and first-degree intentional murder while committing a felony (kidnapping) under aiding-and-abetting theories of liability for insufficiency of the evidence. *Id.* We also

two grounds to reverse his convictions for first-degree murder, attempted first-degree murder, kidnapping, and felony murder.

First, Wiggins argues that the district court abused its discretion by denying his pretrial motion to suppress the cell-site location information ("CSLI")[2] for his cell phone because the facts alleged in the warrant application failed to establish probable cause to search the CSLI records of his cell phone carrier. Second, he argues that the district court abused its discretion by providing the jury a hybrid instruction that relieved the State of its burden to prove: (1) the elements of the offense were committed by a person; and (2) the defendant was criminally liable for that person's actions. Although the district court did not abuse its discretion when it denied Wiggins's pretrial motion to suppress, it did abuse its discretion when it provided the hybrid jury instruction. We therefore reverse the judgment of convictions and remand for further proceedings consistent with this opinion.

---

reversed Segura's remaining convictions and remanded based on erroneous jury instructions that were not harmless beyond a reasonable doubt. *Id.*

[2]    We explained what CSLI is in *State v. Berry*:

> CSLI is distinct from global positioning system (GPS) data. *Cell Phone Location Tracking Primer*, Berkely Law & National Association of Criminal Defense Lawyers (NACDL) https://www.law.berkeley.edu/wp-content/uploads/2015/04/2016-06-07 CellTracking-Primer Final.pdf (last visited Dec. 13, 2022). CSLI refers to the data collected as a cell phone connects to nearby towers. *Id.* CSLI from towers can be used to approximate the cell phone's location using triangulation—an analysis of the phone's location based on the towers to which it connected. *Id.*

982 N.W.2d 746, 751 n.2 (Minn. 2022).

# FACTS

On December 31, 2019, realtor Monique Baugh arrived at a scheduled house showing where she was kidnapped and later shot to death in an alleyway. The same evening, an intruder entered her family home and shot her partner J.M.-M., who ultimately survived. Police investigating the offense uncovered a complex scheme involving Wiggins, his girlfriend Elsa Segura, and two other men, Cedric Berry and Berry Davis.

Security camera footage from an electronics store showed Berry purchasing a cell phone (the set-up phone) on December 29, 2019. CSLI from Berry's personal cell phone showed that his phone was located at that electronics store at the time the set-up phone was purchased. CSLI from Wiggins's personal cell phone also demonstrated that his phone was in the area of the electronics store during the purchase.

Segura used the set-up phone to call Baugh and arrange a house showing for a home in Maple Grove on December 30, 2019. CSLI placed the personal cell phones of Wiggins, Berry, Segura, Davis, and the set-up phone all within the vicinity of Segura's home for half an hour immediately preceding Segura's call to Baugh.

On December 30, 2019, Baugh arrived at the house showing Segura had scheduled, but no one met her for the appointment. CSLI indicated that while Baugh waited at the house, Berry and Davis were nearby. Segura then called Baugh again to reschedule the house showing for the next day at 3 p.m.

On December 31, 2019, Berry and Davis picked up a rented a U-Haul van and drove to the Maple Grove house at which Segura had arranged to meet Baugh. Once there, Berry and Davis kidnapped Baugh from the house, placed her in the back of the van, and drove

4

off. At approximately 5:40 p.m., that van was reportedly seen near Baugh's home in Minneapolis, at which time J.M.-M.—who did not live with Baugh—was at Baugh's home watching their two children. At that point, a man wearing black clothing and a black ski mask entered the home and shot J.M.-M. several times. The man then fled the house. J.M.-M. was able to call 911. An ambulance transported J.M.-M. to the hospital, where he eventually recovered.

About an hour later, gunshot detection technology alerted police to three gunshots near an alleyway in Minneapolis. Police responded within minutes and found Baugh's deceased body in the alley where the gunshots were registered. Traffic camera footage and CSLI showed that Berry and Davis were still traveling together in the rented van and were at the alley where Baugh's body was found at the time the gunshots were detected.

On January 1, 2020, investigating officers asked J.M.-M. who might want to hurt him. J.M.-M. responded, "I think it might have been LA," and confirmed that he meant "LA" from record label Black Bag Entertainment. The officers were aware that Wiggins went by the alias "LA" and that Wiggins was associated with Black Bag Entertainment.

On January 10, 2020, investigating officers filed a search warrant application for the CSLI of four different cell phones, including Wiggins's cell phone. The warrant application contained a detailed description of the crime and a description of the probable cause to search the CSLI records of Wiggins's cell phone carrier. Included in the warrant application was also a supporting affidavit by Sergeant Mark Suchta, a detective in the homicide unit of the Minneapolis Police Department. The affidavit stated that Sergeant Suchta had reviewed Minneapolis Police reports and relayed the information from those

reports regarding the crime. The affidavit also stated that Sergeant Suchta had "recently received an anonymous tip fromt [sic] Crime Stoppers as well as information from a confidential informant that this was a paid hit for the death of Baughs [sic] boyfriend and the person who is responsible is a rival of Baughs [sic] boyfriend that is known to your affiant and Officers as L.W." Sergeant Suchta's affidavit explained that he "was given a known number for L.W. by a licensed police officer who has been investigating L.W. for the last two years," included the phone number, and identified the mobile carrier.

> Your affiant, Sgt. Mark Suchta, is a licensed peace officer for 21 years, currently employed by the City of Minneapolis. He is currently assigned to the Minneapolis Police Department's Homicide unit as a detective. In that capacity, he has reviewed Minneapolis Police reports which have showed the following:
>
> On 12/31/19 Monique Baugh was abducted from [address redacted] Maple Grove while showing a house. She was put in Uhaul [sic] which later drove up to [redacted]. Once at this location a male gunman went inside and shot Baughs [sic] boyfriend multiple times. Approximately an hour later Baugh was found shot multiple times in the alley of [address redacted]. She later died from her injuries. . . .
> . . . .
> Your affiant has also recently received an anonymous tip fromt [sic] Crime Stoppers as well as information from a confidential informant that this was a paid hit for the death of Baughs [sic] boyfriend and the person who is responsible is a rival of Baughs [sic] boyfriend that is known to your affiant and Officers as L.W. Your affiant was given a known number for L.W. by a licensed police officer who has been investigating L.W. for the last two years. Number is is [sic] [redacted]. T-Mobile is the carrier for this number.

A district court judge signed the warrant. The CSLI revealed that Wiggins's cell phone was with Berry's and Davis's cell phones when Berry purchased the set-up phone and when Segura used the set-up phone to arrange the first meeting with Baugh.

6

Wiggins, Segura, Berry, and Davis were indicted by separate grand juries on charges of first-degree murder – premeditated, Minn. Stat. § 609.185(a)(1) (2022); attempted first-degree murder, Minn. Stat. § 609.17 (2022), *see* Minn. Stat. § 609.185(a)(1); kidnapping to commit great bodily harm or terrorize, Minn. Stat. § 609.25, subd. 1(3) (2022); and first-degree murder – intentional while committing a felony (kidnapping), Minn. Stat. § 609.185(a)(3) (2022). Wiggins and Segura were charged on theories of accomplice liability, *see* Minn. Stat. § 609.05 (2022), while Berry and Davis were charged as principals.

Wiggins moved to suppress the CSLI at trial. The district court denied the motion. Wiggins moved for reconsideration of the denial of the motion to suppress. The district court denied the motion for reconsideration.

Over defense counsel's objection, the district court provided the following instruction to the jury for the first-degree murder charge:

The elements of Murder – 1st Degree – Premeditated are:

**First**, the death of Monique Baugh must be proven.

**Second**, the *Defendant or another (or others)* caused the death of Monique Baugh.

**Third**, the *Defendant or that other person(s)* acted with the intent to kill Monique Baugh.

> To find the Defendant had the "intent to kill," you must find the Defendant acted with the purpose of causing death, or believed the act would have that result.

**Fourth**, the Defendant acted with premeditation.

7

"Premeditation" means the *Defendant or another (or others)* considered, planned, prepared for, or determined to commit the act before the *Defendant or that other person(s)* committed it. Premeditation, being a process of the mind, is wholly subjective and hence not always susceptible to proof by direct evidence. It may be inferred from all the circumstances surrounding the event. It is not necessary for premeditation to exist for a specific length of time. While premeditation requires no specific period of time for deliberation, some amount of time must pass between the formation of the intent and the carrying out of the act. A premeditated decision to kill may be reached in a short period of time. However, an unconsidered or rash impulse, even though it includes an intent to kill, is not premeditated.

**Fifth**, the Defendant's act took place on or about December 31, 2019 in Hennepin County.

*If you find that each of these elements has been proven beyond a reasonable doubt, the Defendant is guilty of this charge. If you find that any element has not been proven beyond a reasonable doubt, the Defendant is not guilty, unless you find the State has proven beyond a reasonable doubt that the Defendant is liable for this crime committed by another person* according to the instruction provided above under the heading Liability for Crimes of Another.

(emphasis added.) The district court's jury instructions on the other charges followed this same pattern, using the phrase "defendant or another" in describing the elements of the offense and concluding with the same final paragraph.[3]

The jury found Wiggins guilty on all four charged counts. The district court convicted Wiggins on three counts, excluding the fourth count of felony murder. This appeal followed.

---

[3] The district court provided identical jury instructions to those given in Wiggins's trial to Segura. *State v. Segura*, 2 N.W.3d 142 (Minn. 2024).

8

**ANALYSIS**

This case requires us to answer two questions: (1) whether a search warrant application was sufficiently supported by probable cause; and (2) whether a hybrid jury instruction improperly relieved the State of its burden of proof. We address each issue in turn.

I.

We first turn to the issue of the CSLI. Wiggins claims that the district court abused its discretion by denying his pretrial motion to suppress the CSLI for his cell phone because the facts alleged in the warrant application failed to establish probable cause. For the following reasons, we conclude that the district court did not abuse its discretion.

The United States and Minnesota Constitutions grant the right of people "to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV; Minn. Const. art. I, § 10. If a search warrant is not supported by probable cause, then it is unreasonable. *State v. Yarbrough*, 841 N.W.2d 619, 622 (Minn. 2014). Probable cause requires a "fair probability that contraband or evidence of a crime will be found in a particular place." *State v. Wiley*, 366 N.W.2d 265, 268 (Minn. 1985) (internal quotation marks omitted) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

We review only the warrant application and supporting affidavits to determine if "the issuing judge 'had a substantial basis for concluding that probable cause existed.' " *State v. Fawcett*, 884 N.W.2d 380, 384–85 (Minn. 2016) (quoting *State v. Rochefort*,

631 N.W.2d 802, 804 (Minn. 2001)). This requires application of the "totality of the circumstances" test:

> [T]he magistrate's task is "simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place."

*State v. McCloskey*, 453 N.W.2d 700, 702 (Minn. 1990) (quoting *Gates*, 462 U.S. at 238). When we perform a totality of the circumstances analysis on a warrant application, "[w]e defer to the issuing magistrate, recognizing that doubtful or marginal cases should be largely determined by the preference to be accorded to warrants." *Fawcett*, 884 N.W.2d at 385 (internal quotation marks omitted) (quoting *McCloskey*, 453 N.W.2d at 704); *see also State v. Harris*, 589 N.W.2d 782, 791 (Minn. 1999); *Wiley*, 366 N.W.2d at 268.

Therefore, the question we must ask is whether the totality of the circumstances alleged in the search warrant application established a "fair probability" that evidence of a crime would be found in the CSLI records of Wiggins's cell phone carrier. The warrant application included the following relevant information:

> Your affiant, Sgt. Mark Suchta, is a licensed peace officer for 21 years, currently employed by the City of Minneapolis. He is currently assigned to the Minneapolis Police Department's Homicide unit as a detective. In that capacity, he has reviewed Minneapolis Police reports which have showed the following:
>
> On 12/31/19 Monique Baugh was abducted from [address redacted] Maple Grove while showing a house. She was put in Uhaul [sic] which later drove up to [redacted]. Once at this location a male gunman went inside and shot Baughs [sic] boyfriend multiple times. Approximately an hour later Baugh was found shot multiple times in the alley of [address redacted]. She later died from her injuries. . . .

10

. . . .

Your affiant has also recently received an anonymous tip fromt [sic] Crime Stoppers as well as information from a confidential informant that this was a paid hit for the death of Baughs [sic] boyfriend and the person who is responsible is a rival of Baughs [sic] boyfriend that is known to your affiant and Officers as L.W. Your affiant was given a known number for L.W. by a licensed police officer who has been investigating L.W. for the last two years. Number is is [sic] [redacted]. T-Mobile is the carrier for this number.

These portions of the supporting affidavit contain information about two distinct tips related to the crimes, the details of those crimes, and the personal knowledge of the affiant and of other officers. First, we evaluate the reliability of the information in the tips, then the bases of knowledge of the tips, and finally we evaluate the totality of the circumstances. Second, we consider Wiggins's challenges to the affidavit's reliability.

A.

As practical matter, we must first determine the substance of the tips. The affidavit clearly identifies two tips, one coming anonymously from Crime Stoppers and another from a confidential informant. The two tips contain the same information because the affidavit does not distinguish between the information received from the anonymous tip and that received from the confidential informant. The language of the affidavit shows that both tips contained information that the crime was (1) a paid hit; and (2) the person who was responsible was Baugh's boyfriend's rival. The district court interpreted the warrant application in this manner, and it is a reasonable interpretation.

What is not clear from the affidavit, however, is whether either tip identified Wiggins by name or by an alias (like his alias LA), or simply identified a "rival of Baugh's

11

boyfriend" without using a name.[4]  When considering the motion to suppress the CSLI

warrant, the district court determined that a common-sense reading shows that it was the

*officers* who knew Wiggins was J.M.-M.'s rival and that the tips potentially did not even

name Wiggins.  Given the deference a reviewing court is to give an issuing magistrate,

*Fawcett*, 884 N.W.2d at 385, we read the affidavit in the same way.  So both tips indicated

that the crimes were the result of a paid hit on Baugh's boyfriend, J.M.-M., and that the

person responsible was a rival of J.M.-M.  Wiggins's identity as a rival of J.M.-M. is

distinct from those tips.

Next, we must determine whether these tips are corroborated by anything else in the

affidavit.  In certain cases, multiple tips that corroborate each other may provide a

substantial basis when determining probable cause.  *See United States v. Jackson*, 898 F.2d

79, 81 (8th Cir. 1990) (finding mutual corroboration when police received the two tips

about a marijuana grower from a male and from a female, both who claimed to be related

to another female involved with the grower);  *United States v. Keys*, 721 F.3d 512, 518

(8th Cir. 2013) (finding mutual corroboration when two sources identified the same suspect

who had supplied them with crack cocaine).  Wiggins speculates that these tips may have

come from the same individual.  Yet the differing circumstances underlying these tips tend

to indicate that they were made by *different* individuals.  The confidential informant spoke

with the police directly and their identity was known to, at the very least, affiant Sergeant

---

[4]    The affidavit consistently used the convention of naming potential suspects with
their initials.  There is no dispute that L.W. means Lyndon Wiggins; we do not read the
affidavit to indicate that Baugh's boyfriend's rival was identified specifically by any party
using the initials "L.W."

Suchta, suggesting that the informant was more concerned with the police receiving the information than with their anonymity. Conversely, the Crime Stoppers tipster valued their anonymity above the guaranteed delivery and impact of their information. The distinguishable motivations suggest distinct individuals.

Even so, this is not the only way to corroborate tips from informants. If part of an informant's tip may be corroborated by police as truthful, that tends to suggest that the entire tip may be truthful. *State v. Olson*, 436 N.W.2d 92, 95 (Minn. 1989) *aff'd*, 495 U.S. 91 (1990) (citing *State v. Siegfried*, 274 N.W.2d 113, 115 (Minn. 1978)).[5] Here, the details in the affidavit supplied by Sergeant Suchta, who was investigating the crimes, described facts that were consistent with a "paid hit." The affidavit states that: (1) Baugh was kidnapped; (2) put into a U-Haul; (3) which drove to her home; (4) where a gunman entered the home and shot her boyfriend (J.M.-M.) multiple times; (5) she was then driven some distance away to an alley; and (6) an hour later, was shot multiple times. The affidavit also noted that Baugh's wrists had been bound with duct tape and referred to her death as an execution. Each informant's tip described these crimes as a "paid hit for the death of Baugh's boyfriend." Because the part of the tips regarding a "paid hit" were corroborated by the details of the police investigation cited in the affidavit, this

---

[5]     *Siegfried*, 274 N.W.2d at 113, was decided before the United States Supreme Court's decision in *Gates*, 46 U.S. at 230–33, which replaced the "rigid" *Aguilar* test used by *Siegfried* with the totality of the circumstances test. However, the factors determining reliability of an informant in *Siegfried* are still good law. We have continued to cite *Siegfried*'s analysis on informant reliability after the *Gates* decision. *See Olson,* 436 N.W.2d at 95; *McCloskey*, 453 N.W.2d at 703; *State v. Jones*, 678 N.W.2d 1, 11 (Minn. 2004); *State v. Carter*, 697 N.W.2d 199, 206 (Minn. 2005).

corroboration suggests that the other portion of the tips—asserting that the person responsible was a "rival" of J.M.-M.—was also truthful. Here, even "minimal corroboration" is a relevant factor in a totality of the circumstances assessment of probable cause. *McCloskey*, 453 N.W.2d at 704.

Wiggins contends that the warrant application was deficient because it failed to explain why police believed Wiggins was the rival referenced by the tips. In support of his argument, Wiggins relies on *State v. Souto*, in which we held that an officer's statement that the defendant was a known drug dealer plus an informant's tip were together insufficient to establish probable cause. 578 N.W.2d 744, 749 (Minn. 1998). Because the officer's statement was "too vague and conclusory" to corroborate the otherwise uncorroborated tip, we held the warrant did not establish probable cause. *Id.*; *see also State v. Doyle*, 336 N.W.2d 247, 251 (Minn. 1983) (holding that the value of an affiant's statement that the defendant had been dealing drugs for years was lessened because the statement was "conclusory and d[id] not provide a clue as to the source of the information").

But those cases are not analogous to the circumstances seen here. The affidavit makes no conclusory statements about Wiggins. Instead, the affidavit contains a source for the information that tied Wiggins to the crime—his rivalry with J.M.-M.—the basis of knowledge for this presumably being the officer who had investigated Wiggins for 2 years. There is no suggestion that Wiggins was a known criminal, nor that he was a suspect in other paid hits, but rather, and very specifically, that Wiggins was known to be J.M.-M.'s rival.

Although our totality of the circumstances analysis is limited to the information contained in the warrant application and supporting affidavit, we must not review each individual component of the affidavit in isolation. *Fawcett*, 884 N.W.2d at 384–85. Instead, we must look at those components to determine if the issuing magistrate "ma[de] a practical, common-sense decision whether, given *all the circumstances* set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information," probable cause exists. *Id.* at 385 (emphasis added) (quoting *State v. Jenkins*, 782 N.W.2d 211, 223 (Minn. 2010) .

As discussed, the officers knew Wiggins to be J.M.-M.'s rival. The basis for this knowledge can be inferred from the affidavit, which states that the affiant received a known phone number from an officer who had been investigating Wiggins for 2 years. After all, a "common-sense" interpretation of that part of the affidavit strongly suggests that an officer who had been investigating a person for 2 years would invariably have knowledge of that person's rivals and have shared pertinent information with officers investigating other crimes. *McCloskey*, 453 N.W.2d at 702.

The information in the warrant application's supporting affidavit includes two corroborated tips that the crimes were the result of a "paid hit" by J.M.-M.'s rival and an officer's base of knowledge that indicates Wiggins is the "rival" referenced in those tips. The issuing magistrate considered all the circumstances and made a common-sense determination that there was a fair probability that evidence of a crime would be found in the requested CSLI. Therefore, under the totality of the circumstances test, the district

court did not abuse its discretion when it denied Wiggins's pretrial motion to suppress the CSLI from his cell phone.

B.

Wiggins, however, maintains that the totality of the circumstances threshold is not crossed here because the informants referenced in the affidavit are unreliable. He claims that because the informants were neither Confidential Reliable Informants (CRI) nor first-time citizen informants, their hearsay information is unreliable. We note that in cases involving an informant, whether the warrant application "establish[es] probable cause to search depends on the totality of the circumstances of the particular case, *including* the credibility and veracity of the informant." *State v. Munson*, 594 N.W.2d 128, 136 (Minn. 1999) (emphasis added) (citing *McCloskey*, 453 N.W.2d at 703). As discussed above, the totality of the circumstances contained in the affidavit establish sufficient probable cause to support the warrant application, but for the sake of thoroughness, we will address whether the two informants here can be considered reliable.

Multiple factors determine whether informants are reliable. Two such factors are whether the informant is a CRI or a first-time citizen informant, both of whom are presumed to be reliable. *See McCloskey*, 453 N.W.2d at 701–703 (establishing the presumed reliability of CRIs and first-time citizen informants); *see also State v. Mosley*, 994 N.W.2d 883, 890–91 (Minn. 2023) (discussing the reliability of informants with a record of truthful tips (i.e., CRIs)). A CRI is a distinct type of informant characterized by a proven track record of accurate tips, but reliability is presumed only if a CRI is designated as such in the warrant application. *Mosley*, 994 N.W.2d at 885; *see Wiley*, 366 N.W.2d at

16

269. Similarly, a warrant application must explicitly designate a first-time citizen informant as someone "not part of the criminal milieu" for presumed reliability. *See Siegfried*, 274 N.W.2d at 115.

In this case, the warrant application did not identify either informant as a CRI or an informant with a track record, nor did the warrant application state that either was "not part of the criminal milieu." *Id.* Thus, neither informant can be automatically *presumed* to be reliable. *Id.*; *Mosley*, 994 N.W.2d at 885. But the fact that an informant is not presumed to be reliable does not make that informant per se unreliable. *McCloskey*, 452 N.W.2d at 703. Factors indicating reliability include identifying oneself to police, providing statements against interest, *see McCloskey*, 453 N.W.2d at 703–04, and corroboration of facts in the tip, *see id.* at 704; *Wiley*, 366 N.W.2d at 269. Factors indicating unreliability include involvement with criminal activity and providing information that conflicts with other known facts. *See Siegfried*, 274 N.W.2d at 114–15.

The first tip was provided to police through Crime Stoppers of Minnesota—a nonprofit organization that enables persons to report crime information anonymously without fear of retaliation. Crime Stoppers' concern for the safety of its tipsters through anonymity does not grant this informant presumed reliability, but the emphasis on anonymity is relevant to the issuing magistrate's analysis. The submission of a tip through a community safety organization indicates that the informant's goal is to contribute to community safety while avoiding retaliation. Given the information relayed by the tipster, fear of lethal retaliation was arguably justified. The potential danger that the informant

17

was putting themselves in by supplying a tip at all—even an anonymous one—tends to make the tipster slightly more reliable than not.

Regarding the second tip, this informant was described not as anonymous, but rather as a "confidential informant." The reliability of the informant cannot be presumed because the informant was not described in the warrant application as a CRI. Still, identifying oneself to police suggests, but does not establish, reliability. *McCloskey*, 452 N.W.2d at 704 ("[W]e believe that the fact the informant came forward and met with the sheriff rather than completely hiding behind the cloak of telephonic anonymity . . . is significant."). Further, exposing oneself to police as a person with knowledge of a "paid hit" has the very real possibility of turning the eye of the investigation toward the informant, which would not be in the interest of the informant—also suggesting reliability. *See id.* (describing "fear of retribution" as "a good reason for wanting anonymity"). While the warrant application failed to state that the informant was not involved in criminal activity, there is also nothing in the warrant that suggests criminal involvement; thus, we cannot determine that the tip was unreliable. *Id.* at 703 ("The fact that the informant here did not qualify as a citizen informant of presumed reliability does not mean that the informant was an informant of doubtful reliability from the criminal subculture."). Moreover, we have held that knowing the identity of the informant is a reliability factor that can outweigh facts indicating unreliability, like criminal involvement. *See id.* at 703–04. Here, the second tipster was a confidential informant whose identity was known to police and who voluntarily provided information to the police, which outweighs any perceived unreliability, tending to make the tip more reliable than not.

Wiggins argues that both these tips indicated criminal involvement by the informant because only someone involved in the criminal milieu would have knowledge of a paid hit. But one does not have to be a criminal to have knowledge of an acquaintance's criminal activity. Moreover, when considering a challenge to the reliability of informants, we evaluate "police knowledge of both the tipster *and* the factual circumstances surrounding the tip." *Matter of Welfare of G.M.*, 560 N.W.2d 687, 691 (Minn. 1997) (emphasis added). As discussed, these tips were corroborated, in part, by facts known to police, which adds to their reliability.

Wiggins also claims that because these informants' bases of knowledge were not particularized in the warrant application, this omission requires a finding of unreliability. But following the United States Supreme Court's decision in *Illinois v. Gates*, a warrant application's failure to describe an informant's basis of knowledge is not dispositive, by itself, because under the totality of the circumstances analysis adopted in *Gates*, a deficiency in the basis of knowledge may be compensated for by other indicia of reliability. 462 U.S. at 233; *see McCloskey*, 453 N.W.2d at 703–04. Here, the credibility of the tips offsets the insufficient bases of knowledge.

Given the deference we show to an issuing magistrate, *Fawcett*, 884 N.W.2d at 385, and based on our foregoing analysis, we decline to hold that either informant was not at least somewhat reliable. Thereby, we confirm our totality of the circumstances analysis from Section I.A. We acknowledge that this is a close case, but under well-established law, "doubtful or marginal cases should be largely determined by the preference to be

accorded to warrants." *Id.* (internal quotation marks omitted) (citing *McCloskey*, 453 N.W.2d at 704); *see also Harris*, 589 N.W.2d at 791; *Wiley*, 366 N.W.2d at 268.

We therefore conclude that the district court did not abuse its discretion when it denied Wiggins's motion to suppress the CSLI.[6]

## II.

The next question before us is whether the district court committed reversible error when it instructed the jury that it could find Wiggins guilty if Wiggins "or another (or others)" satisfied each element of the offense. District courts have "considerable latitude" in drafting jury instructions. *State v. Carridine*, 812 N.W.2d 130, 144 (Minn. 2012). We review jury instructions for abuse of discretion. *Id.*; *State v. Huber*, 877 N.W.2d 519, 522 (Minn. 2016) ("We review a district court's jury instructions for an abuse of discretion."); *State v. Mahkuk*, 736 N.W.2d 675, 682 (Minn. 2007) ("We will not reverse a trial court's decision on jury instructions unless the trial court abused its discretion.") However, a district court abuses its discretion when its jury instructions confuse or mislead the jury, or materially misstate the law. *State v. Kelley*, 855 N.W.2d 269, 274 (Minn. 2014). At trial, defense counsel objected to the instructions given, reasoning that "if the jury finds that someone else committed the crime, that would be sufficient to find Mr. Wiggins guilty." We agree.

---

[6]    Because we hold that the facts alleged in the warrant application established probable cause to search the specified location records associated with Wiggins's cell phone, we need not decide whether the CSLI was properly admitted under any exception to the warrant requirement.

20

Wiggins's co-defendant, Segura, was charged with the same offenses as Wiggins, and during her trial, the district court provided identical jury instructions to those given in Wiggins's trial. *State v. Segura*, 2 N.W.3d 142 (Minn. 2024). Segura appealed her convictions, arguing in part that the district court committed reversible error by giving these jury instructions. *Id.* at 149. After considering Segura's arguments, we held that the "instructions materially misstate the law because they—by their plain language—allow the jury to convict Segura of kidnapping for the actions of others *without* reaching the issue of her liability under an aiding-and-abetting theory." *Id.* at 167.

The hybrid instructions did not require the jury to find Segura criminally liable for a principal's actions in order to find her guilty.[7] *Id.* We found this error was not harmless beyond a reasonable doubt.[8] *Id.* Because the district court abused its discretion by

---

[7] As we explained in *Segura*, the error in the instruction was that "[t]he jury could find that the State proved beyond a reasonable doubt that (1) another person confined or removed Monique Baugh from one place to another without her consent, (2) the other person acted for the purpose of committing great bodily harm on the person of Monique Baugh or terrorizing Monique Baugh, and (3) that Segura took some action on December 29–31 in Hennepin County. Under the plain language of the instructions, the jury could convict Segura of kidnapping based on these findings alone." 2 N.W.3d at 167. The same error exists here. Under the plain language of the instructions, the jury could convict Wiggins of first degree premediated murder if it found that (1) the death of Monique Baugh was proven, (2) that another person caused her death, (3) that another person acted with the intent to kill her, (4) that another person considered, planned, prepared for, or determined to commit the act before another person committed it, and (5) that Wiggins took some action on December 31, 2019, in Hennepin County.

[8] In *Segura*, we explained that "[g]iven th[e] presumption [that juries follow instructions given by the district court], and based on the material misstatement of the law in the jury instructions and the overwhelming evidence that Berry and Davis kidnapped and murdered Baugh, we cannot say—beyond a reasonable doubt—that the erroneous instructions had no significant impact on the jury's verdict." *Segura*, 2 N.W.3d at 167. The

providing hybrid instructions that misstated the law, we reversed the judgment of the convictions in Segura's case and remanded for further proceedings consistent with our opinion. *Id.* at 42. Here, we do the same, and reverse the judgment of Wiggins's convictions and remand for further proceedings consistent with this opinion. This means the CSLI for Wiggins's cell phone may be introduced as evidence in future proceedings because the warrant application established probable cause.

## CONCLUSION

For the foregoing reasons, we reverse the judgment of convictions and remand to the district court for further proceedings consistent with this opinion.

Reversed and remanded.

---

same conclusion is compelled here, where Wiggins, like Segura, was charged on a theory of accomplice liability and the same instructions were given to the jury.